837 So.2d 1219 (2003)
Jimmy and Brenda BONNETTE, et al.
v.
CONOCO, INC., et al.
No. 2001-C-2767.
Supreme Court of Louisiana.
January 28, 2003.
*1221 Kenneth R. Spears, SWIFT, SPEARS & HARPER, Lake Charles; Mark R. Zehler, Robert E. Arceneaux, Joseph E. LeBlanc, Jr., Eric E. Jarrell, Timothy S. Madden, Elizabeth S. Wheeler, New Orleans, Counsel for Applicant.
William B. Baggett, Roger G. Burgess, BAGGETT, MCCALL, BURGESS & WATSON, Lake Charles, Counsel for Respondent.
Keith Borman, Leah Lorber, Luis A. Perez-Hernandez, Sherman Joyce, Counsel for American Tort Reform Association (Amicus Curiae).
Keith Borman, Mark A. Behrens, Quentin Riegel, Victor E. Schwartz, Luis A. Perez-Hernandez, Counsel for National Association of Manufacturers (Amicus Curiae).
Keith Borman, Leah Lorber, Luis A. Perez-Hernandez, Mark A. Behrens, Counsel for Chamber of Commerce of the United States (Amicus Curiae).
Keith Borman, Leah Lorber, Mark A. Behrens, Luis A. Perez-Hernandez, Victor *1222 E. Schwartz, Counsel for American Petroleum Institute (Amicus Curiae).
Keith Borman, Luis A. Perez-Hernandez, Jr., Victor E. Schwartz, Leah Lorber, Mark A. Behrens, Counsel for Louisiana Association of Business & Industry (Amicus Curiae).
Keith Borman, Luis A. Perez-Hernandez, Counsel for Louisiana Midcontinental Oil & Gas Association (Amicus Curiae).
M. Dwayne Johnson, Charles S. McCowan, Jr., Shannan Sweeney Rieger, Baton Rouge, James R. Young, Uma M. Subramanian, Counsel for Louisiana Chemical Association, Louisiana Chemical Industry Alliance, American Chemistry Council, American Petroleum Institute (Amicus Curiae).
M. Dwayne Johnson, Baton Rouge, Luis A. Perez-Hernandez, Shannan S. Rieger, Baton Rouge, Uma M. Subramanian, James R. Young, Charles S. McCowan, Jr., Baton Rouge, Louisiana Mid-Continent Oil & Gas Association (Amicus Curiae).
Carmack M. Blackmon, Baton Rouge, Counsel for Louisiana Railroads Association (Amicus Curiae).
Martha Y. Curtis, James M. Garner, Keith A. Kornman, New Orleans, Counsel for Murphy Oil USA Inc. (Amicus Curiae).
Stephen A. Bokat, Counsel for National Chamber Litigation Center Inc. (Amicus Curiae).
Luis A. Perez-Hernandez, Counsel for Coalition for Asbestos Justice Inc., and Louisiana Chapter of the National Federation (Amicus Curiae).
KIMBALL, Justice.[*]
This case arises out of the delivery of soil, which was discovered to contain solid pieces of transite,[1] to numerous residents of Westlake, Louisiana. One hundred forty-three plaintiffs filed suit, alleging that they were exposed to asbestos derived from pieces of transite from abandoned houses near the Conoco refinery in Westlake. After a bench trial on the merits, the trial court concluded plaintiffs were entitled to several items of damage, including damages for increased risk of contracting an asbestos-related disease, damages for mental anguish, punitive damages and property damages. The court of appeal affirmed the judgment of the trial court. After reviewing the record in its entirety, we reverse those portions of the judgment of the court of appeal that affirm the trial court's awards for increased risk of contracting an asbestos-related disease, emotional distress, and punitive damages. We affirm that portion of the judgment of the court of appeal that affirms the trial court's award of property damages.

Facts and Procedural History
The record reveals that in the spring of 1994, Conoco, Inc. ("Conoco") initiated the pre-construction phase of a Lube Oil Hydrocracker Project ("LOHC"). Completion of the project required the demolition of abandoned houses on property owned by Conoco, as well as the excavation and removal of approximately 400,000 cubic yards of soil. Consequently, Conoco contracted with Daigle Brothers, Inc. ("Daigle") and two other individual dump truck drivers to excavate and remove the soil from the project site.
Plaintiffs purchased some of the soil from Daigle and spread it on the lawns of their homes. Several months later, a Westlake resident discovered solid pieces *1223 of material containing asbestos in the soil originating from the project site.
Upon receiving inquiries about whether the soil from its project site contained asbestos, Conoco set up a hotline designed for concerned citizens. The hotline provided a vehicle for testing soil suspected of containing asbestos. According to the testimony of Ms. Angela Queenan, the project manager for the "clean-up," Conoco also offered to remediate any lawns believed to contain soil from the LOHC site. Conoco sent certified asbestos inspectors to the homes of individuals who suspected that they had received soil from the site to inspect the properties for the presence of transite. If no transite or other asbestos-containing materials were found during a visual inspection, Conoco offered to send a crew to the residences to sample the soil. In cases where the test results were negative, no further steps were taken. In situations where transite was found, Conoco offered to either remove the soil and replace it with new soil or leave the soil in place and "cap" it by placing six additional inches of topsoil over the original soil. All of the plaintiffs represented herein elected to have their soil removed and replaced. The remediation for the properties of these four families has been completed, and there are no issues regarding the quality of the remediation in this case.
On July 31, 1995, plaintiffs filed a petition for class action against Conoco and Daigle, alleging that the soil they purchased contained "harmful and dangerous materials, including asbestos and/or lead."[2] Plaintiffs claimed defendants were negligent in that they knew or should have known: (1) that the soil was contaminated before allowing it to be transported; and (2) that the soil from the project site should not have been deposited in residential areas or any other areas outside the Conoco premises. Plaintiffs further contended that defendant should have tested the soil prior to allowing it to be transported from the Conoco premises. Additionally, plaintiffs alleged that defendants were strictly liable for depositing the hazardous soil throughout Westlake and Calcasieu Parish because defendants were the owners and/or custodians of the soil and the hazardous properties of the soil, along with the failure of notice, caused the soil to be unreasonably dangerous. Plaintiffs sought punitive damages for defendants' reckless and wanton disregard for public safety in the storage, handling, and transportation of hazardous substances. In addition to punitive damages, plaintiffs also sought compensatory damages for, inter alia, damage to their property and landscape, exposure to the contaminated soil, and "emotional fears worrying about the presence of the dirt on their property and the contaminants therein."
The claims of four families were the subject of the instant trial.[3] A six-week *1224 bench trial was held on the merits, during which a virtual "battle of the experts" ensued. Following the trial, the trial court ruled in favor of plaintiffs. The trial court made the following specific findings:
1. Conoco knew or should have known that the soil being excavated from the project site was being delivered to local residents.
2. The soil that was delivered to plaintiffs from the Conoco site was contaminated with asbestos-containing material and free asbestos fibers.
3. Asbestos can be cancer causing and extremely dangerous to the health of those who are exposed to it.
4. Conoco had a duty to determine whether or not its soil contained asbestos.
5. Conoco had a duty to ensure that the soil was disposed of in a proper fashion.
6. Effective means of testing could have determined the contents of the soil prior to its excavation and transportation to plaintiffs' property.
7. Conoco had a duty to determine whether or not the soil being excavated and transported contained asbestos or other hazardous materials.
8. Conoco knew or should have known that soil leaving its properties would ultimately contain asbestos particles and fibers.
9. Conoco breached its duty to plaintiffs by failing to take reasonable and prudent steps to determine whether or not the soil contained asbestos prior to excavating and transporting it.
10. Conoco breached its duty to plaintiffs by failing to test the soil before transporting it to plaintiffs.
11. Conoco breached its duty to inform Daigle and the other haulers that the soil potentially contained asbestos particles or asbestos fibers.
12. The contamination of plaintiffs' yards and the insides of their homes led to a significant devaluation of their properties.
13. Plaintiffs' homes are still contaminated with asbestos fibers and asbestos-containing materials which originated from the contaminated soil distributed by Conoco.
14. Plaintiffs were exposed to some asbestos fiber count which exceeded that of normal ambient air for the entire period of time that the asbestos contaminated soil remained on their properties.
15. Plaintiffs' everyday use of their lawns and driveways caused asbestos fibers to be released into the air.
16. Plaintiffs were exposed to asbestos during the normal activities on their properties and brought asbestos fibers and particles into their homes.
17. Plaintiffs' additional exposure to asbestos fibers was "slight."
18. But for the failure of Conoco to prevent the release of the asbestos-containing soil, plaintiffs would not have experienced this increased exposure to harmful respirable asbestos fibers over and above those found in ambient air.
19. It is more probable than not that plaintiffs have suffered a "slight" increased risk of developing an asbestos-related disease due to their exposure to an increased asbestos fiber count.
20. Plaintiffs have a reasonable fear that they are more likely to develop cancer than had they not been exposed to the asbestos fibers in question.
21. Plaintiffs are entitled to punitive damages because Conoco was reckless in some degree.
The trial court uniformly fixed the general damages for past, present, and future mental anguish for the adult plaintiffs, except George Shephard, at $12,500.00. *1225 Thereafter, the court awarded each adult plaintiff $10,000.00 for "physical injury and an increased risk of developing asbestos related cancer." Damages awarded to the three minor children were fixed at $20,000.00 for past, present, and future mental anguish, and $20,000.00 for "physical injury and an increased risk of developing asbestos related cancer." The court found that plaintiffs' properties suffered a 10% diminution in value as a result of receiving contaminated soil. The court specifically declined to award any sum for abatement of the asbestos contained in plaintiffs' homes. Each plaintiff was also awarded $7,500.00 in punitive damages. Additionally, individual damages for the adult plaintiffs were awarded as follows:
Heather Lambert:
Past Medical Expenses$1,500.00;
Future Medical Expenses (psychotherapy)$4,000.00;
Property Damage$1,300.00
David Lambert:
Past Medical Expenses$900.00;
Property damage$1,300.00
Christine Goodness:
Past Medical Expenses$1,500.00;
Future Medical Expenses (psychotherapy)$6,250.00;
Property Damage$1,800.00
David Goodness:
Past Medical Expenses$1,500.00;
Future Medical Expenses (psychotherapy)$6,250.00;
Property Damage$1,300.00
Lasalle Williams:
Past Medical Expenses$900.00;
Future Medical Expenses (psychotherapy)$4,000.00;
Property Damage$3,600.00
Betty Williams:
Past Medical Expenses$900.00;
Property Damage$3,600.00
Glenda Williams:
Past Medical Expenses$900.00
Kathy Shephard:
Past Medical Expenses$900.00;
Property Damage$700.00
George Shephard:
Property Damage$700.00
Conoco appealed the trial court's judgment, and the court of appeal affirmed the judgment. Bonnette v. Conoco, Inc., 01-0297 (La.App. 3 Cir. 9/12/01), 801 So.2d 501. The court of appeal held that punitive damages were warranted pursuant to La. C.C. art. 2315.3 due to Conoco's unreasonable and reckless behavior in removing and transporting the asbestos-contaminated soil from the project site. The court of appeal also held that the trial court did not abuse its discretion by awarding each plaintiff $7,500.00 for punitive damages. Additionally, the court of appeal affirmed the trial court's ruling that plaintiffs' exposure to asbestos, along with the psychological trauma resulting from the exposure, warranted recovery for fear of contracting cancer. Next, the court of appeal found no error in the trial court's award of compensatory damages for increased risk of developing an asbestos-related disease. Finally, the appellate court held that the property owners were entitled to damages for decreased value of their homes.
We granted Conoco's application for certiorari to address the correctness of the judgment of the court of appeal. Bonnette v. Conoco, Inc., 01-2767 (La.1/11/02), 804 So.2d 649.

Discussion

Motion to Strike Daubert Issue
After the briefs were filed in the matter, but prior to oral argument, plaintiffs filed a Motion to Strike Conoco's argument that the testimonies of two of plaintiffs' expert witnesses should be excluded, pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and State v. Foret, 628 So.2d 1116 (La.1993). *1226 Plaintiffs urge that Conoco did not include that particular argument in its application for a writ of certiorari, raising the issue for the first time in this court in its brief for oral argument. To support their contention, plaintiffs cite this court's recent decision in Boudreaux v. State, Dept. of Transp. & Dev., 01-1329 (La.2/26/02), 815 So.2d 7.
Conoco opposed the motion, arguing that this case is distinguishable from Boudreaux because, unlike the defendant in that case, it raised and preserved the Daubert objection in the lower courts. Conoco also contends that it did not abandon the Daubert issue because it "expressly reserved" the issue in a footnote in its writ application.
In Boudreaux, the defendant filed an application for a writ of certiorari in this court, advancing three writ grant considerations. After this court granted certiorari, the defendant made numerous other arguments before the court and only argued one of the considerations previously urged. This court held that the issues advanced in the writ application, but not briefed for oral argument, were abandoned. This court also found that the additional questions briefed for oral argument, but not contained in the original writ application, were not properly before the court, stating:
It is axiomatic that our rules are fashioned to assist us in the exercise of our discretionary jurisdiction. It is for that reason that we promulgated rules that mandate assignments of error in the application for writs and a memorandum which addresses with particularity the reasons why we should exercise our discretionary jurisdiction. This procedure allows for the best use of our judicial function in developing Louisiana jurisprudence. Correlatively, if this Court is to sharpen the focus on those issues most worthy of consideration and hasten the decisional process, it is imperative that we not be blind sided after we grant a writ application with questions which did not appear in the application for a writ of certiorari.[4]
Id. at p. 4-5, 815 So.2d at 10-11 (footnotes omitted).
La. Sup.Ct. R. X, § 1(b), provides, in pertinent part:
The application for writs shall address, in concise fashion, why the case is appropriate for review under the considerations stated in subsection (a) above.... *1227 Additionally, La. Sup.Ct. R. X, § 3(3) provides that a writ applicant in civil cases must submit a memorandum containing assignments of error and an "argument of each assignment of error on the facts and law, addressing particularly why the case is appropriate for review under the considerations stated in Section 1(a) of this rule." The procedures contained within these rules provide a standard to aid this court in the exercise of its discretionary authority. Boudreaux, 01-1329 at p. 3, 815 So.2d at 10.
In this case, Conoco did not particularly address the Daubert issue in its application for a writ of certiorari. Rather than include this argument along with its other arguments, Conoco relegated the matter to a footnote, "reserving the right" to challenge certain testimony on Daubert grounds should this court grant its writ. We find such a "reservation of rights" is insufficient to properly place this issue before this court as the Daubert issue was neither presented in the application for certiorari nor fairly included in the questions that were presented. For the reasons we stated in Boudreaux, we find that the Daubert issue is not properly before this court. Therefore, the argument contained in Conoco's fifth assignment of error in its brief for oral argument will not be considered by this court.

Standard of Review
The court of appeal should not set aside the factual findings of a trial court absent manifest error or unless clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, if a court of appeal finds that the trial court committed a reversible error of law or manifest error of fact, the court of appeal must ascertain the facts de novo from the record and render a judgment on the merits. LeBlanc v. Stevenson, 00-0157 (La.10/17/00), 770 So.2d 766. Although appellate courts should accord deference to the factfinder, they nonetheless have a constitutional duty to review facts. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, p. 8 (La.7/5/94), 639 So.2d 216, 221. Because appellate courts must perform this constitutional function, they have every right to determine whether the trial court verdict was clearly wrong based on the evidence or clearly without evidentiary support. Id. at p. 8-9, 639 So.2d at 221. The reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State of Louisiana, through Dep't of Transp. & Dev., 617 So.2d 880, 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was reasonable. Id. We have previously emphasized the principle that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 882-83 (citing Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990))).
Damages for Physical Injury and Increased Risk Developing Asbestos-Related Cancer
In its first assignment of error, Conoco argues that the lower courts erred in awarding damages for increased risk of future injury, as plaintiffs have not yet experienced a compensable injury.[5] Conoco *1228 contends plaintiffs were not exposed to significant quantities of asbestos and have no increased risk of injury, or, at best, only an unquantified theoretical increased risk of injury.
In Adams v. Johns-Manville Sales Corp., 783 F.2d 589 (5th Cir.1986), Ernest Adams sued certain manufacturers and/or marketers of asbestos-containing products, seeking, inter alia, to recover compensatory damages for increased risk of developing cancer and for fear of contracting cancer. The trial court excluded all evidence of any alleged increased risk of cancer and mental anguish resulting from that increased risk, stating:
Plaintiff Adams does not now have cancer and by whatever definition plaintiff wishes to use, any reference that he may or might have cancer in the future is only a possibility. There can be no causal link with an injury when that injury hasn't yet occurred....
Adams, 783 F.2d at 591. On original hearing, the United States Court of Appeal, Fifth Circuit, affirmed the jury verdict in favor of defendants. Adams v. Johns-Manville Sales Corp., 727 F.2d 533 (5th Cir.1984). On rehearing, the Fifth Circuit submitted to this court the following questions:
1. Whether Louisiana law permits a plaintiff in a products liability action to recover damages for an increased risk of contracting cancer in the future in the absence of any evidence that the plaintiff currently has cancer or, within reasonable medical probability, will contract cancer in the future.
2. Whether Louisiana law permits a plaintiff in a products liability action to recover damages for mental anguish arising from his fear of contracting cancer in the future based on evidence that the plaintiff is at an increased risk of contracting cancer but in the absence of any evidence that the plaintiff currently has cancer or, within reasonable medical probability, will contract cancer in the future.
Adams v. Johns-Manville Sales Corp., 756 F.2d 1068, 1069 (5th Cir.1985).
This court declined certification without comment. Adams v. Johns-Manville Sales Corp., 467 So.2d 529 (La.1985). Thereafter, the federal appellate court, in *1229 considering a petition for rehearing filed by Adams, stated that Adams' proffered evidence of increased risk of developing cancer from exposure to asbestos products was inadmissible. Adams, 783 F.2d 589 (5th Cir.1986). The court noted that Adams proffered evidence failed to establish that his exposure to defendants' products "probably" caused an increased risk of cancer. The court stated:
Adams' proffer consisted of admittedly "sketchy" testimony to be given by a Dr. Joseph Wagoner. It stated Dr. Wagoner would rely on an article published in the British Journal of Industrial Medicine. The article studied asbestos workers certified as having asbestosis and followed the progression of their disease and the cause of death. The article then deduced that increases in risk of cancer for such workers correlated with percentages of disablement suffered by such workers. The proffer, however, failed to indicate that Adams could prove he suffered any percentage of disablement from inhalation of asbestos fibers which would establish the probable risk of cancer Dr. Wagoner would fix for Adams. The second part of Adams' proffer was a statement that Dr. Comstock would testify "concerning the increased risk of cancer of an insulator with Mr. Adams' record of exposure to asbestos and Mr. Adams' record of smoking cigarettes." Again the proffer was left in general terms never made specifically applicable to Adams in terms of medical probability.
Adams, 783 F.2d at 592.
Several years after the federal court's decision in Adams, this court was presented with the question of "whether asymptomatic plaintiffs, who have had significant occupational exposure to asbestos and must now bear the expense of periodic medical examinations to monitor the effects of that exposure have suffered `damage' under Louisiana Civil Code article 2315." Bourgeois v. A.P. Green Industries, Inc., 97-3188 (La.7/8/98), 716 So.2d 355, 357 ("Bourgeois I"). In Bourgeois I, the plaintiffs, past and present employees of Avondale Shipyards, filed suit alleging that they were exposed to asbestos-containing products. At the time of the suit, none of the plaintiffs had been diagnosed with any asbestos-related injury or disease. The principle relief sought by the plaintiffs was the establishment of a judicially administered fund to cover the costs of regular medical examinations to facilitate the early detection and treatment of possible latent diseases. This court stated:
Unlike a car crash, asbestos exposure is an accident almost always without impact. Nevertheless, it is still an accident that can have consequences every bit as real as those sustained in a head-on collision. In fact, it is precisely because asbestos can have such deadly consequences that plaintiffs, regardless of whether or not they are currently suffering from a disease, are often encouraged to submit to regular diagnostic testing.
Id. at 358-59. This court went on to conclude that the reasonable cost of medical monitoring is a compensable item of "damage" in the form of the costs required to pay for this care, provided that a plaintiff satisfies the following criteria:
(1) Significant exposure to a proven hazardous substance;
(2) As a proximate result of this exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease;
(3) Plaintiff's risk of contracting a serious latent disease is greater than (a) the risk of contracting the same disease had he or she not been exposed and (b) the chances of members of the public at large of developing the disease;

*1230 (4) A monitoring procedure exists that makes the early detection of the disease possible;
(5) The monitoring procedure has been prescribed by a qualified physician and is reasonably necessary according to contemporary scientific principles;
(6) The prescribed monitoring regime is different from that normally recommended in the absence of exposure;
(7) There is some demonstrated clinical value in the early detection and diagnosis of the disease.
Id. at 360-61.[6]
Thus, it is clear that when the instant suit was filed, Louisiana law provided a remedy in the form of medical monitoring for asymptomatic plaintiffs who had been exposed to asbestos. However, unlike the Bourgeois plaintiffs, who sought the establishment of a fund to cover the costs of medical monitoring, plaintiffs herein sought damages, inclusive of "punitive or exemplary, compensatory, clean-up damages, and other damages reasonable in the premises, past, present, and future." In turn, the trial court awarded an assortment of damages to each plaintiff, including damages for physical injury and increased risk of developing asbestos-related cancer. The trial court stated:
This Court finds that for the entire period of time that the asbestos contaminated soil remained on the plaintiffs' properties, they were exposed to some asbestos fiber count which exceeded that of normal ambient air.... This Court finds that the plaintiffs' additional exposure to asbestos fibers was slight. This Court finds that it is more probable than not that the plaintiffs have suffered an increased risk of developing an asbestos related disease but that the increased risk is also slight. This Court finds that the plaintiffs have suffered an injury because they have been exposed to an asbestos fiber count which places each of them at an increased risk of developing an asbestos related cancer.
We find no manifest error in the trial court's conclusions that plaintiffs were exposed to an asbestos fiber count that slightly exceeded that of normal ambient air and that it is more probably than not that plaintiffs have suffered a slightly increased risk of developing an asbestos-related disease.
In this case, then, we are confronted with the question of whether Louisiana law permits the recovery of compensatory damages for a "slight" exposure to asbestos, which placed plaintiffs at a "slightly" increased risk of contracting cancer in the future, in the absence of evidence that any plaintiff currently has cancer, or any other asbestos-related condition.
A review of jurisprudence from other states reveals that a majority of jurisdictions have not recognized a cause of action *1231 for increased risk of future injury when the potential for the occurrence of future injury is speculative or merely "possible." See Kelley v. Cowesett Hills Ass'n, 768 A.2d 425 (R.I.2001) (holding "that the possibility of contracting cancer resulting from mere exposure to a carcinogen, although potentially increasing one's risk of developing cancer, is too tenuous to be a viable cause of action"); Cleveland v. Johns-Manville Corp., 547 Pa. 402, 690 A.2d 1146 (1997) (explaining that Pennsylvania law does not recognize claims for increased risk of cancer "where cancer is not present, thus eliminating the recovery of damages based on a speculative future event, the possible occurrence of cancer"); Capital Holding Corp. v. Bailey, 873 S.W.2d 187 (Ky.1994) (finding that plaintiff's cause of action does not accrue until he can prove some physically harmful result from his exposure to a toxic substance); Mauro v. Raymark Indus., Inc., 116 N.J. 126, 561 A.2d 257 (1989) (observing that the majority of courts are uniform in their conclusion that in order to recover damages for enhanced risk of contracting a serious illness due to exposure, "plaintiff must prove that the prospective disease is at least reasonably probable to occur").
Turning our attention to the instant case, we decline to extend Bourgeois I to allow the recovery of compensatory damages for a "slightly" increased risk of developing cancer. In Bourgeois I, this court allowed recovery under limited circumstances of medical monitoring costs to plaintiffs suffering an increased risk of contracting a serious latent disease when they can successfully prove by competent expert testimony, inter alia, that they have suffered a significant exposure to a hazardous substance and the increased risk of developing such a disease is significant. We find it would be nonsensical to allow a plaintiff to recover compensatory damages for an increased risk of developing an asbestos-related disease upon less proof than that required for recovery of medical monitoring expenses.
In the instant case, plaintiffs offered the testimonies of several experts to support their allegation that they were exposed to asbestos fibers, and consequently, they have an increased risk for developing asbestos-related conditions. Dr. James R. Millette, an environmental scientist who was accepted as an expert in the fields of environmental science and microscopy, testified that he performed microscopic testing on the following samples associated with this case: (1) bulk pieces of transite taken from the soil in plaintiffs' yards; (2) dust samples obtained from inside of plaintiffs' homes; (3) air samples taken from plaintiffs' homes; and (4) water samples obtained from plaintiffs' water supply.
Dr. Millette stated that the soil he tested contained a combination of chrysotile[7] asbestos and asbestos cement. Dr. Millette recorded a videotape depicting his examination of the samples of the pieces of transite obtained from plaintiffs' lawns. In the videotape, Dr. Millette pointed out asbestos fibers which were protruding from the edge of the bulk material. Dr. Millette testified that the asbestos materials were friable[8] in the sense that fibers will be released when they are abraded or scratched. The doctor demonstrated this in the videotape by rubbing his finger across the fibers, resulting in some particles falling off, releasing dust fibers. He also demonstrated that asbestos fibers were released when the bulk pieces were *1232 stepped upon. Dr. Millette explained that the fibers themselves were too large to be respirable, but they were capable of being inhaled and broken down into smaller, respirable fibers. He also opined that respirable-sized fibers are released when the larger fibers are abraded.
Dr. Millette testified that his analysis of the settled dust samples from each of the properties at issue contained various amounts of asbestos. He also stated that the evidence of the asbestos cement material found in the dust was similar to that found in the soil. Dr. Millette further testified that the air monitoring performed during the remediation process revealed asbestos in levels below the limit of detection.
Dr. John M. Dement, an industrial hygenist and epidemiologist, also testified on behalf of plaintiffs. He stated that inhalation is the primary method of exposure to asbestos, and there is no level of cumulative exposure below which there is no increased risk for asbestos-related diseases. He stated that any increase in exposure results in a risk above that for the general population. Dr. Dement also testified that mesothelioma may result from exposure to low levels of asbestos and from very brief exposures.
Dr. Dement further testified that every person exposed to asbestos will not suffer an adverse health effect because people differ in their susceptibility to developing a disease. He also stated that although the level of exposure that plaintiffs in this case received cannot be quantified, plaintiffs have an increased risk of developing asbestos-related cancers based on the presence of asbestos in the soil on their lawns and inside of their homes.
Dr. Richard A. Lemen, an epidemiologist, also testified on plaintiffs' behalf. He stated that many everyday activities performed by plaintiffs can generate dust, some of which contained asbestos fibers. He testified that any level of exposure to asbestos will place an individual at risk for developing asbestos-related conditions. Dr. Lemen further testified that there is no "safe" level of exposure to any carcinogen because immune systems vary from person to person, and everyone is in a different state of health. He also stated that some individuals, particularly young children and older adults, are more susceptible, and their likelihood of developing disease can be much greater. He further stated that there have been no studies conducted to show how many asbestos fibers will be necessary to cause asbestos-related disease.
Conoco introduced the testimony of a barrage of expert witnesses to refute plaintiffs' allegation that they were exposed to asbestos which places them at an increased risk for developing asbestos-related disease. Dr. Richard J. Lee examined samples from the soil, dust, air, and water on behalf of Conoco. He testified that the samples from the soil, dust, and air were below the limit of detection for asbestos and that the only meaningful asbestos fibers he detected were found in the water samples of the homes.[9] Dr. Lee opined that since there was asbestos in the water, there would be an on-going source of asbestos particles in the dust or whereever water is used. He also testified that asbestos fibers were detected in other sources in some of the homes, such as the window caulking, floor tiles and linoleum, and roofing materials.
*1233 Dr. Lee also testified that the asbestos found in the bulk pieces removed from plaintiffs' lawns was non-friable and would not release loose fibers unless it was "severely abraded." When asked what effect would activities such as mowing the lawns, raking, and shoveling have on the solid pieces of asbestos-containing material, Dr. Lee responded that when there is a low concentration of material in the soil, there is a reduced chance that the material would be affected by everyday activities.
Mr. William Coltrin, the program manager for the asbestos and lead section of the Louisiana Department of Environmental Quality ("DEQ") and a certified asbestos inspector, also testified. He stated that transite is normally considered non-friable, but he admitted that it can be rendered friable by "external forces." Mr. Coltrin testified that if the transite material was subjected to enough pressure, it could be turned "into a dust, and that dust has potential to become airborne and if the fibers are small enough, then you can breathe them in...." He further stated that if transite is run over with a lawnmower, "projectile" and "breakage" problems would result.
Dr. Stanley M. Pier, an expert in the field of environmental toxicology, testified that plaintiffs have not sustained any significant exposure to asbestos, and they do not have any increased risk for the development of any disease attributable to asbestos. Dr. Pier explained that plaintiffs' theory is based on the "no threshold dose response model" utilized by the United States Department of Labor's Occupational Safety and Health Administration (OSHA), which indicates that there is no level of exposure below which there is not some risk of disease. In Dr. Pier's opinion, the no threshold model is inappropriate in situations involving asbestos.
It is abundantly clear that none of the experts could conclude that any of the plaintiffs had suffered any "significant" exposure to asbestos fibers. Furthermore, the experts admittedly could not quantify the degree of exposure that plaintiffs experienced, if in fact they were exposed. At best, the testimony adduced from plaintiffs' experts demonstrated: (1) that the soil, air, and dust samples showed the presence of a small amount of asbestos; (2) that it is possible that activities performed by plaintiffs could have resulted in the release of asbestos fibers; (3) that if loose fibers were in fact released, it is possible that some of those fibers were respirable; and (4) that if some of the fibers were respirable, it is possible that plaintiffs could have inhaled asbestos fibers during the period that the soil remained on the property. The trial court therefore correctly determined that plaintiffs' exposure to asbestos fibers in addition to those found in ambient air, was "slight," and that any increased risk of contracting an asbestos-related health condition was also "slight." Under the circumstances, plaintiffs have failed to prove they are entitled to compensatory damages for an increased risk of developing an asbestos-related disease. Accordingly, the judgment of the court of appeal affirming the trial court's award of damages for "physical injury and an increased risk of developing asbestos related cancer" is reversed.

Mental Anguish Damages
Conoco also contends that the award for damages for past, present, and future mental anguish was erroneous under the facts of this case. Specifically, Conoco alleges that plaintiffs' fear, if any, is unreasonable due to the insignificant amount of asbestos they allegedly inhaled and its insignificant effect on their risk of contracting an asbestos-related disease.
*1234 In Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974), this court reinstated a trial court's award for anxiety and mental anguish suffered by a plaintiff whose right hand was permanently disabled by radiation burns resulting from defendant's negligence. In finding the court of appeal had erred in reversing the trial court's award for fear of cancer and of future progression of the disability, this court stated:
We find, for instance, no warrant for the intermediate court to disregard as noncompensable the fear with which the plaintiff lives every day that the condition in his hand might start spreading and he might have to lose his fingers. While to a scientist in his ivory tower the possibility of cancerous growth may be so minimal as to be untroubling, we are not prepared to hold that the trier of fact erred in finding compensable this real possibility to this worrying workman, faced every minute of his life with a disabled and sometimes painful hand to remind him of his fear.
Id. at 353 (internal citation omitted). As can be seen, however, Anderson is distinguishable from the case at bar as it involved an award for mental anguish accompanied by a manifest physical injury.
In Moresi v. State, Dept. of Wildlife & Fisheries, 567 So.2d 1081 (La.1990), this court held that a defendant will generally not be held liable where his conduct is merely negligent and causes only emotional injury unaccompanied by physical injury. This court noted deviations from this general rule in various situations, including those cases that involve "fright or nervous shock, where the plaintiff was actually in great fear for his personal safety." Id. at 1096. This court concluded that cases allowing exceptions to the general rule all involve "the especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." Id.
The problems inherent in awarding damages for mental disturbance in the absence of manifest physical injury are particularly pronounced in cases involving exposure to asbestos or other carcinogens. These concerns were confronted by the United States Supreme Court in Metro-North Commuter Railroad Co. v. Buckley, 521 U.S. 424, 434, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997). In that case, the Court was faced with the issue of whether the Federal Employers' Liability Act ("FELA") allowed a worker who had been exposed to asbestos, but did not have any symptoms of a disease, to recover damages for fear of developing a disease in the future. The Court held that the plaintiff could not recover under FELA for negligent infliction of emotional distress unless, and until, he had manifested symptoms of a disease. The Court stated:
[T]he physical contact at issue herea simple (though extensive) contact with a carcinogenic substancedoes not seem to offer much help in separating valid from invalid emotional distress claims. That is because contacts, even extensive contacts, with serious carcinogens are common. They may occur without causing serious emotional distress, but sometimes they do cause distress, and reasonably so, for cancer is both an unusually threatening and unusually frightening disease. The relevant problem, however, remains one of evaluating a claimed emotional reaction to an increased risk of dying. An external circumstance exposuremakes some emotional distress more likely. But how can one determine from the external circumstance of exposure whether, or when, a claimed strong emotional reaction to an increased mortality risk ... is reasonable and genuine, rather than overstatedparticularly when the relevant *1235 statistics themselves are controversial and uncertain (as is usually the case), and particularly since neither those exposed nor judges or juries are experts in statistics? The evaluation problem seems a serious one.
Id. at 521 U.S. 434-35, 117 S.Ct. at 2119-20 (internal citations omitted).
Similarly, in Temple-Inland Forest Products Corp. v. Carter, 993 S.W.2d 88 (Tex.1999), a case in which electrical workers filed suit, based upon an exposure to asbestos products, the Texas Supreme Court stated:
A person exposed to asbestos can certainly develop serious health problems, but he or she also may not. The difficulty in predicting whether exposure will cause any disease and if so, what disease, and the long latency period characteristic of asbestos-related diseases, make it very difficult for judges and juries to evaluate which exposure claims are serious and which are not. This difficulty in turn makes liability unpredictable, with some claims resulting in significant recovery while virtually indistinguishable claims are denied altogether. Some claimants would inevitably be overcompensated when, in the course of time, it happens that they never develop the disease they feared, and others would be undercompensated when it turns out that they developed a disease more serious even than they feared.... Indeed, most Americans are daily subjected to toxic substances in the air they breathe and the food they eat. Suits for mental anguish damages caused by exposure that has not resulted in disease would compete with suits for manifest diseases for the legal system's limited resources. If recovery were allowed in the absence of present disease, individuals might feel obliged to bring suit for such recovery prophylactically, against the possibility of future consequences from what is now an inchoate risk. [footnote omitted]. This would exacerbate not only the multiplicity of suits but the unpredictability of results.
Id. at 93.
Thus, under the rule announced in Moresi, which must be stringently applied in asbestos exposure cases due to their inherently speculative nature, in order for plaintiffs to recover emotional distress damages in the absence of a manifest physical injury, they must prove their claim is not spurious by showing a particular likelihood of genuine and serious mental distress arising from special circumstances.
In the instant case, the trial court failed to apply the correct standard in evaluating plaintiffs' emotional distress claims. Instead of determining whether plaintiffs proved a particular likelihood of genuine and serious mental distress arising from special circumstances, the trial court evaluated the evidence to determine whether plaintiffs' fears of developing cancer were reasonable.[10] Such an evaluation constituted legal error. In light of this legal error, we must review the record de novo to determine whether plaintiffs proved they are entitled to emotional distress damages.
The record indicates that while plaintiffs expressed a generalized fear of *1236 contracting an asbestos-related disease, they failed to prove they suffered genuine and serious mental distress arising from the placement of asbestos-containing soil on their properties. Except for the chest X-rays arranged by plaintiffs' attorneys in the weeks prior to trial, plaintiffs did not seek medical treatment for their alleged physical concerns due to their exposure to the contaminated soil. In fact, the trial court's award of past medical expenses to each adult plaintiff equaled the amount charged by a psychiatrist and his associate to evaluate plaintiffs prior to trial at the request of plaintiffs' counsel. Additionally, while voicing concerns about their exposure to asbestos, some plaintiffs were exposed to small amounts of asbestos in their window caulking, floor tiles, and drinking water, but failed to have these sources of asbestos removed. The Lamberts testified they were concerned that asbestos fibers from the soil were tracked into their home and remained in their carpets, but they have never had the carpets tested for asbestos or removed. Dr. James M. Anderson, a psychiatrist who evaluated the adult plaintiffs, with the exception of George Shephard, at the request of plaintiffs' counsel, testified that some plaintiffs' preexisting anxiety disorders were aggravated by the stress of the exposure to asbestos and other plaintiffs' preexisting health conditions were exacerbated by the worry associated with the exposure to asbestos. Dr. Anderson also testified that some plaintiffs were depressed due to the additional stress created by the contaminated soil. Based on the evidence presented by plaintiffs concerning emotional distress they suffered because of the placement of asbestos-containing soil on their properties, we cannot say they suffered from genuine and serious mental distress that guarantees their claim for mental distress damages is not spurious.
While we recognize that much of the general public exhibits a degree of anxiety concerning exposure to asbestos and asbestos-containing materials, it is a fact of modern life that most of us are exposed to de minimus amounts of asbestos on a daily basis. Plaintiffs have failed to prove their exposures resulted in a particular likelihood of genuine and serious mental distress. They are therefore not entitled to emotional distress damages. The judgment of the court of appeal affirming the trial court's award of damages for plaintiffs' "past, present, and future mental anguish" is reversed.

Punitive Damages
In its next assignment of error, Conoco contends that the trial court erred in awarding plaintiffs punitive damages pursuant to former La. C.C. art. 2315.3.[11] Prior to its repeal in 1996, Article 2315.3 provided in pertinent part:
In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.
Conoco maintains that the award was made in error because its actions did not rise to the level of "wanton or reckless," and it was not involved in the "storage, handling, or transportation of hazardous or toxic substances."
The statute providing for exemplary damages for wanton and reckless disregard for public safety in storage, *1237 handling or transportation of hazardous or toxic substances must be strictly construed, as it imposes penalty. In re New Orleans Train Car Leakage Fire Litigation, 95-2710, 95-2721, 96-0016, 95-2734, 95-2, 671 So.2d 540 (La.App. 4 Cir. 3/20/96); writ denied, 96-0972, 96-0977, 96-0978, 96-0984, 96-1287, 96-1311 (La.6/28/96), 675 So.2d 1120-21; cert. denied, 519 U.S. 1009, 117 S.Ct. 512, 136 L.Ed.2d 402. To obtain an award of exemplary or punitive damages under La. C.C. art. 2315.3, the plaintiff must prove: (1) that the defendant's conduct was wanton and reckless by proving that "the defendant proceeded in disregard of a high and excessive degree of danger, either known to him or apparent to a reasonable person in his position, or that the defendant engaged in "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent;" (2) that the danger created by the defendant's wanton or reckless conduct threatened or endangered public safety; (3) that the defendant's wanton or reckless conduct occurred in the storage, handling or transportation of hazardous or toxic substances; and (4) that the plaintiff's injury was caused by the defendant's wanton or reckless conduct. Billiot v. B.P. Oil Co., 93-1118, pp. 16-17 (La.9/29/94), 645 So.2d 604, 613.
It is unclear whether the trial court applied the correct standard to determine whether Conoco's conduct was "wanton or reckless" under this court's jurisprudence interpreting La. C.C. art. 2315.3. Without elaborating on its findings, the trial court simply found that Conoco was "reckless in some degree," but that its recklessness did not rise "to levels that substantial punitive damages should be awarded." We agree with the court of appeal's statement that "[t]here are no degrees of recklessness." Bonnette at p. 4, 801 So.2d at 508. We disagree, however, with its decision to evaluate the trial court's ambiguous finding of "somewhat reckless" conduct under a manifest error standard of review and find the trial court's award of punitive damages in this case must be reviewed de novo.
The evidence presented at trial revealed that prior to the excavation of the soil, Conoco performed a Level I site assessment, in which the properties were visually inspected. David Williams, the Conoco employee in charge of environmental concerns for the LOHC project, prepared an asbestos investigation report in which he noted that the Level I assessment revealed the existence of transite on the exterior of two of the abandoned houses on the site. However, a Level II assessment, which involves collecting samples, was not performed. According to Mr. Williams, who had no experience with asbestos or any asbestos-related training, the Level II assessment was not performed because it was not required by law. Furthermore, despite Conoco's policy that soil samples must be taken when an area is excavated and analyzed for hazardous materials, Mr. Williams admitted that he never told anyone about the presence of asbestos on the site. Rather, haulers were contracted to haul the soil away, without any indication that the transite was present at the site from which the soil was taken. It was DEQ that notified Conoco that hazardous material had been found in the soil from the LOHC project site after one of the property owners discovered the transite on his property.
Mr. William Coltrin, the program manager for the asbestos and lead section of the DEQ and a certified asbestos inspector, testified that at the time of the demolition of the homes at the Conoco site, he was aware that some of the homes contained transite siding. He offered unrefuted testimony that Conoco did not violate *1238 any DEQ asbestos regulations in the demolition of the houses because, at the time of the demolition, single family dwellings were not subject to DEQ regulation. Mr. Coltrin explained that because the demolition was a non-regulated activity, the removal of the soil was also not subject to DEQ regulation. Mr. Coltrin stated that because the transite in question was non-friable, Conoco was permitted to dispose of it in the manner in which it did. He further testified that once it was discovered that the soil in plaintiffs' yards contained pieces of transite, Conoco contacted the DEQ to ascertain how to remove and dispose of the soil and was advised to merely pick up the obvious pieces of transite and dispose of it properly. However, he testified, "Conoco volunteered to go past that and remove soils and transite and to put the property back in the same state as it had been when the dirt was put there and spread." Mr. Coltrin stated that Conoco's actions were "really in excess of what we would have required of them." Mr. Coltrin further testified that DEQ would likely have allowed Conoco to leave the soil in plaintiffs' yards once the pieces of transite were removed.
In light of Mr. Coltrin's uncontroverted testimony, we find that Conoco's conduct did not rise to the level of "wanton or reckless" as required by La. C.C. art. 2315.3. Although the actions of Mr. Williams, including his failure to take any steps to inform anyone of the presence of asbestos on the site, leave much to be desired, it is clear that Conoco's actions were not in violation of any DEQ regulation. Because Conoco acted in compliance with DEQ regulations in effect during the events at issue, we cannot say that defendant's conduct was highly unreasonable or that it involved an extreme departure for ordinary care. Accordingly, the trial court's award for punitive damages is hereby reversed.[12]

Damages for Diminished Property Values
In its final assignment of error, Conoco argues that the trial court erred in awarding plaintiffs damages for diminution in property value. Conoco contends that the expert testimony presented by plaintiffs and relied upon by the trial court is based upon an unproven assumption "that the presence of some small pieces of transite in a yard located in a neighborhood where other houses are totally encased in the same material has the same `blight' effect as a high probability of flooding." Additionally, Conoco asserts that plaintiffs' expert did not consider the valuable improvements Conoco made to plaintiffs' properties during its abatement activities.
Plaintiffs called Mr. Leonard E. Pauley, Jr. as an expert in real estate appraisal. Mr. Pauley appraised each plaintiff's property using a typical Fannie Mae report to ascertain the market value of the property. Mr. Pauley performed the first appraisal as if the properties were free of any "outside influence," and then prepared a report to ascertain a "stigma adjustment." Mr. Pauley testified that plaintiffs' property suffered a 10% diminution in value following the events in question, assuming that all asbestos fibers were cleaned from the properties. Mr. Pauley based his opinion on the impact that the floods of 1980 and 1982 had on the Cherryhill Subdivision, which is located in the same general area as plaintiffs' properties. Mr. Pauley stated that after the flood, the houses decreased in value, and potential home buyers were reluctant to buy homes in that subdivision. He concluded that the slow sales "implies that there was more resistance *1239 towards purchasing in the subdivision after the flood, which leads me to believe that the public opinion was adversely affected because of the flood even though this had never happened before this time period and has not happened since."
Mr. Pauley opined that plaintiffs' property values would be lower even after the property had been remediated due to the "stigma effect" the presence of asbestos would have on the properties. He explained that when plaintiffs attempt to sell their properties, they will have to disclose the fact that the property had once been contaminated with asbestos-containing soil. He stated that in his opinion, the buying public would demonstrate some resistance to buying the property once the disclosure is made. He also stated that most prudent buyers would be more likely to buy a house that has never been contaminated with a hazardous substance than one that has been contaminated and remediated. He stated that the word "asbestos" is frightening to people because most people are aware that it is a carcinogen, and even if it is cleaned up, people are still concerned. Mr. Pauley agreed that the improvements Conoco made to plaintiffs' properties during remediation enhanced the outward appearance of the homes and could make the homes "more sellable." However, he testified that a home that is more sellable is not necessarily more valuable. Mr. Pauley stated that improving the looks of a home does not necessarily change its value.
Conoco called Mr. Charles N. Cummings as an expert in real estate appraisal, including the appraisal and evaluation of property that has been allegedly environmentally impacted. Mr. Cummings concluded that none of plaintiffs' properties suffered any diminution in value due to the contamination of the soil. Mr. Cummings testified that the stigma effect diminishes rapidly after the remediation process is complete. He then testified as to the post-remediation value of plaintiffs' properties, taking into consideration a potential stigma effect on each of the properties. Mr. Cummings stated that, in fact, Conoco's remediation efforts, which included landscaping, added value to plaintiffs' properties. Thus, Mr. Cummings concluded that plaintiffs' properties were not adversely affected by the stigma of having had asbestos-containing materials on their lawns. He opined that a potential buyer would prefer a property that has been contaminated and remediated over one that has never been remediated. He explained that property that has been remediated has been declared "safe," while it is unknown whether that which has never been remediated is safe.
After considering the above testimony regarding the value of plaintiffs' property values following the placement of contaminated soil on their lawns and subsequent remediation, the trial court concluded that the properties suffered a 10% devaluation due to the stigma of having been contaminated with asbestos. In reaching this conclusion, the trial court found that the only credible evidence presented regarding this issue was the testimony of Mr. Pauley. The court specifically found the testimony of Mr. Cummings was not credible, stating:
It is significant to note that this Court finds that the direct examination testimony of Conoco's real estate expert was totally incredible. Mr. Charles Cummings testified that it was his opinion that future purchases of the plaintiffs' properties would be more likely to buy a home that had been contaminated with asbestos and cleaned, than a home never contaminated with asbestos. In addition, it is important to note Mr. Cummings was viewed by this Court by his demeanor, overall presence as a direct *1240 examination witness, and his apparent lack of candor under cross-examination. This Court finds that the only credible testimony given by Mr. Cummings as to causation, came while he was pressed under cross-examination to admit that all of this findings were based upon removal of all asbestos materials from the properties and that he had never been informed by Conoco that asbestos may have remained in the plaintiffs' homes.
The court of appeal concluded it was in agreement with the trial court's findings as to the diminution of plaintiffs' property values and affirmed the trial court's judgment in this respect.
The principle that questions of credibility are for the trier of fact to resolve applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883.
In the instant case, the trial court was clearly presented with two permissible views of the evidence, and it is apparent that the court found one expert credible and one incredible. Therefore, we find the trial court's award of property damages based on a 10% diminution in value due to the "stigma effect" was neither manifestly erroneous nor clearly wrong. Accordingly, the judgment of the court of appeal affirming the trial court's award for property damage is affirmed.

Decree
For the foregoing reasons, we reverse those portions of judgment of the court of appeal that affirm the trial court's awards of damages for "physical injury and an increased risk of developing asbestos-related cancer," "past, present, and future mental anguish," and "punitive damages." That portion of the judgment of the court of appeal that affirms the trial court's awards for "property damage" is affirmed.
AFFIRMED IN PART AND REVERSED IN PART.
JOHNSON, J., concurs in part, dissents in part and assigns reasons.
JOHNSON, Justice, concurring, in part; dissenting, in part.
I concur with the majority's opinion to the extent that it affirms the trial court's awards for property damage. Conoco argues that the trial court erred in awarding plaintiffs damages for diminution in property value. According to Conoco, "the lower courts' award of stigma damages to plaintiffs' property ignores the uncontroversial evidence of a net increase in value...." Regarding diminished property value, plaintiffs' real estate expert, Leonard Pauley, testified that plaintiffs' property suffered a 10% diminution in value, assuming that all asbestos fibers were cleaned from the properties. Conversely, defense expert, Charles Cummings, testified that Conoco's remediation efforts in fact increased plaintiffs' property values.
Regarding Mr. Cummings' testimony, the trial court stated:
[T]his court finds that the direct examination testimony of Conoco's real estate expert was totally incredible. Mr. Charles Cummings testified that it was his opinion that future purchasers of the plaintiffs' properties would be more likely to buy a home that had been contaminated with asbestos and cleaned, than a home never contaminated with asbestos. In addition, it is important to note Mr. Cummings was viewed by this Court by his demeanor, overall presence as a direct examination witness, and his apparent lack of candor under cross-examination. This Court finds that the *1241 only credible testimony given by Mr. Cummings as to causation came while he was pressed under cross-examination to admit that all of his findings were based upon removal of all asbestos materials from the properties and that he had never been informed by Conoco that asbestos may have remained in the plaintiffs' homes.
(Emphasis added)
The trial court was clearly presented with two permissible views of the evidence, and it is apparent that the court disbelieved the testimony of Conoco's real estate expert. Based upon my review of the testimony, I cannot say that the trial court's finding was clearly wrong. Accordingly, I agree with the majority's affirmance of the trial court's award for diminished property value.
However, I dissent from the results reached by my colleagues herein in all other respects.

Significant Exposure to a Proven Hazardous Substance.
The trial court, after hearing all of the testimony and the evidence presented, indicated that it was particularly persuaded by the testimony of plaintiffs' expert witnesses. After reviewing the record in its entirety, I cannot disagree. It is undisputed that asbestos is a known hazardous substance. The testimony reveals that inhalation is the primary method of exposure to asbestos. The contaminated soil remained in place on plaintiffs' lawns for nearly two years. While none of the experts could quantify plaintiffs' levels of exposure, many of them conceded that many everyday activities would have generated loose, respirable asbestos fibers. Defendants contend that any exposure that plaintiffs might have is de minimus. What they fail to consider is the fact that their testing and air sampling was performed after the visible pieces of transite had been removed from the premises. Furthermore, the samples collected by defendants were admittedly collected during a time that the soil was being wet down to decrease the circulation of dust.

Increased risk of contracting a disease.
No particular level of quantification is necessary to satisfy the requirement of increased risk. Bourgeois, 716 So.2d at 360. A plaintiff need not prove a certain probability of actually suffering physical harm because of his or her exposure. It is sufficient that the plaintiff show a significant degree of increased risk. Id. In addition, the plaintiff must prove that the illness, the risk of which has been increased by the exposure, is both serious and latent. Id.
Dr. John M. Dement, an industrial hygenist and epidemiologist, testified on behalf of plaintiffs that the biological effects of exposure to asbestos fibers include asbestosis, mesothelioma, increased risk of general gastrointestinal cancer, cancer of the larynx, and cancer of the kidneys. According to Dr. Dement, inhalation is the primary method of exposure to asbestos, and there is no level of cumulative exposure below which there is no increased risk for asbestos-related diseases. He stated that any increase in exposure results in a risk above that for the general population. Dr. Dement testified that mesothelioma may result from exposures to low levels of asbestos, as evidenced by the wives of workers who contracted asbestos-related diseases by washing their husbands' asbestos-contaminated clothing and childre n who contracted asbestos-related diseases from residing in these households. He also stated that mesothelioma may result from very brief exposures.
Dr. Dement further testified that every person exposed to asbestos will not suffer an adverse health effect because people differ in their susceptibility to developing a disease. He also stated that although the *1242 level of exposure that plaintiffs in this case received cannot be quantified, plaintiffs have an increased risk of developing asbestos-related cancers based on the presence of asbestos in the soil on their lawns and inside of their homes.
Dr. James A. Merchant, a pulmonary physician and epidemiologist also testified that plaintiffs have an increased risk of developing asbestos-related diseases, particularly lung cancer and mesothelioma. He stated that the health risk cannot be quantified, and he opined that plaintiffs should undergo a lifetime of medical surveillance to monitor the development and progress of any disease. Dr. Merchant also testified that the latency period for asbestos-induced lung cancer is an average of twenty (20) years; the latency periods for mesothelioma and asbestos-related pleural disease are approximately twenty-five (25) years. He stated that generally, the lower the dose of exposure, the longer the latency period is likely to be.
Dr. James D. Crapo, an expert in "general and internal medicine, pulmonary medicine, diagnosis and treatment of asbestos-related disorders, toxicology, and the application of epidemiology to pulmonary medicine" testified. He testified that in this case, plaintiffs have a zero percent increased risk for disease. He stated that the respiratory system is designed to clean and clear inhaled pollutants.
As mentioned above, plaintiffs lived in close proximity to the soil contaminated with asbestos for approximately twenty months. Some of the airborne fibers were transported into their homes. While it may be true that the respiratory system is equipped to cleanse the body of inhaled pollutants, it is evident from the many cases of asbestos-related diseases that everyone's system is not capable of doing so. As recognized by the experts, the susceptibility for developing such diseases vary on a case by case basis. Thus, I decline to accept the position that plaintiffs are not at risk because of the human's innate ability to rid the body of asbestos fibers.

Plaintiff's risk greater than that of public at large.
In this case, we were presented with testimony to show that we are all exposed to asbestos in that it is a natural product of the environment. The testimony also revealed that asbestos is present in the ambient air breathed by everyone on a daily basis. There was also testimony which showed that asbestos fibers were present in much of the water supply in the Lake Charles area. However, it is clear that, in addition to all of the asbestos present from other sources, plaintiffs suffered a clearly defined environmental exposure to asbestos. Asbestos was present in their soil and in the settled dust in their homes, asbestos which the public at large was not exposed to. Due to that additional exposure, it stands to reason that plaintiffs' risk of disease would be greater than that of the general public, with the possible exception of those who live and work in close proximity of asbestos.

Monitoring procedures/Demonstrated clinical value
As mentioned above, Dr. Merchant recommended x-ray examinations every five years due to the variability in the onset of asbestos-related diseases. He stated that if an abnormality is detected, the examinations should be performed more frequently. Dr. Merchant testified that medical surveillance could provide a means of documenting any other intercurrent conditions. He further testified that early detection of lung cancer, along with medical intervention, could result in a possible cure. He admitted that mesothelioma is almost always fatal, and there is no known effective treatment. Regarding pleural diseases, Dr. Merchant testified that they are usually not fatal, but they can cause *1243 pulmonary impairment, and there is no known medical intervention. Whether medical intervention would be helpful or not, anyone could benefit from the knowledge that they have a serious or fatal medical condition, if for no other reason than to put their affairs in order or spend additional time with loved ones.
Based on the foregoing, I am of the opinion that plaintiffs met their burden of proving a compensable item of damage under the factors set forth in Bourgeois. Accordingly, I believe that the trial court's award of damages for increased risk of developing asbestos-related cancer should be affirmed.

Past, Present, and Future Mental Anguish
Conoco argues that the trial court erred in awarding damages for past, present and future mental anguish based upon the facts of this case. A trial court's findings of fact may not be reversed absent manifest error or unless they are clearly wrong. Stobart v. State of Louisiana, through Dep't of Transp. and Dev., 92-1328 (La.4/12/93), 617 So.2d 880. This court has a constitutional duty to review facts. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216. Because we have this duty, we must determine whether the verdict was clearly wrong based on the evidence, or clearly without evidentiary support. Id. The reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Id. at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. The reviewing court must always keep in mind that "if the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 882-83 (citing Housley v. Cerise, 579 So.2d 973 (La.1991)) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
As the court of appeal pointed out, Louisiana law clearly recognizes a cause of action for the fear of contracting cancer. In a landmark decision, Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974), this court held that fear of developing cancer is not an noncompensable injury. In Anderson, the defendant's employee inadvertently left a radioactive pill at the plaintiff's premises. The plaintiff picked the pill up and kept it for several days in order to return it to the defendant. As a result of handling the radioactive material, the plaintiff suffered radiation burns to his hand. The trial court awarded damages for the physical injury to the plaintiff's hand, as well as damages for anxiety and mental anguish due to the exposure to hazardous materials and the possibility of cancer and of future progression of his injury. The court of appeal reduced the damage award, finding that based on the expert testimony, the possibility of cancer and of future progression of the disability was reasonably remote and that the plaintiff's fears were groundless. This court found no abuse of discretion in the trial court's decision, stating:
We find, for instance, no warrant for the intermediate court to disregard as noncompensable the fear with which the plaintiff lives every day that the condition in his hand might start spreading and he might have to lose his fingers. While to a scientist in his ivory tower the possibility of cancerous growth may *1244 be so minimal as to be untroubling, we are not prepared to hold that the trier of fact erred in finding compensable this real possibility to this worrying workman, faced every minute of his life with a disabled and sometimes painful hand to remind him of his fear.
Id. at 353.
More recently, in Moresi v. State, Through Department of Wildlife and Fisheries, 567 So.2d 1081 (La.1990), this court held that generally, a defendant will not be liable for emotional injury unaccompanied by a physical injury. However, this court went on to state that courts may deviate from the general rule in cases involving "fright or nervous shock, where the plaintiff was actually in great fear for his personal safety." Id. at 1096. This court went on to state the cases which allow deviations from the general rule all involve "the especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." Id. at 1096, citing Prosser & Keeton § 54 at p. 362; W. Malone & L. Guerry, Studies in Louisiana Tort Law, 45 (1970). In this case, it is undisputed that the soil on plaintiffs' property contained transite and that asbestos fibers were found in the settled dust inside plaintiffs' homes. Essentially all of the experts conceded that the transite, in its solid state, was non-friable, but when abraded, could release respirable fibers. In fact, Dr. Millette demonstrated for the court that actions such as rubbing the pieces with a finger and walking on them result in the release of loose fibers. It is also undisputed that the soil remained on plaintiffs' property for approximately twenty months while they performed various day to day activities on it. Whether the exposure to asbestos was significant or not, plaintiffs herein have suffered real and reasonable fear that they may someday suffer serious health conditions as a result of that exposure. Accordingly, I believe that this constitutes especial likelihood of genuine and serious mental distress, arising from the special circumstances" this court referred to in Moresi, supra.
Additionally, plaintiffs have demonstrated a fear for their personal safety, as well as the future health and safety of their families. Dr. James A. Anderson, a psychiatrist who evaluated all of the plaintiffs, with the exception of George Shepard, testified regarding plaintiff's sessions with him. Dr. Anderson opined that Heather Lambert as "significant symptoms of anxiety and depression" which are directly attributable to her exposure to the contaminated soil. Dr. Anderson also stated that Mrs. Lambert's preexisting anxiety disorder was aggravated by the stress of worrying about the long-term effects of her exposure to asbestos and that she "went ballistic" and suffered a "depressive episode" after her exposure to the substance.
Dr. Anderson described David Lambert as being "apprehensive" about the loose fibers in the soil. Mr. Lambert, who is concerned about the future consequences of his exposure, experienced insomnia, nightmares, and shortness of breath at the thought of the possibility that asbestos fibers could still be inside of his home.
Dr. Anderson testified that Kathy Shepard, who has an uncle who died of asbestos-related lung cancer, is also fearful of the future consequences of being exposed to asbestos. Mrs. Shepard reported feelings of depression which she contributed to the contaminated soil.
Lasalle Williams and Betty Williams, who both suffered from various preexisting health conditions, were fearful of the effects that the exposure could have on their current health. Dr. Anderson opined that Mr. Williams' physical symptoms, such as headaches, shortness of breath, chest pain, have been exacerbated by his exposure to *1245 the contaminated soil. Mrs. Williams, who has a history of respiratory problems, was anxious that the exposure to asbestos would affect her breathing. Glenda Williams expressed a primary concern for future health problems.
Dr. Anderson testified that Christine Goodness has a predisposition to panic disorder and described her as "psychologically vulnerable." Mrs. Goodness also suffers from panic attacks and multiple phobias. Dr. Anderson diagnosed her with major depression and generalized anxiety disorder, and he opined that the stress as a result of her exposure to asbestos exacerbated her preexisting condition.
Finally, David Goodness reported that the exposure to asbestos is "depressing." Dr. Anderson testified that Mr. Goodness has a history of chronic depression, and the impact of the additional stress caused by the exposure to asbestos was magnified by his mood disorder.
After hearing all of the testimony and reviewing all of the evidence, the trial court concluded that all of the plaintiffs, except Mr. Shepard, has suffered "mental anguish arising out of fear of developing asbestos-related disease." The court went on to state:
This fear resulted form the plaintiffs' knowledge of their probable exposure to asbestos fibers from the contaminated soil and their general knowledge that asbestos fibers can cause cancer.
In my opinion, the trial court was not clearly wrong in finding that plaintiffs suffered mental anguish as a result of their exposure to the asbestos contaminated soil. Accordingly, I would affirm the trial court's awards for damages for past, present, and future mental anguish.

Punitive Damages
Conoco contends that the trial court erred in awarding plaintiffs punitive damages pursuant to LSA-C.C. art. 2315.3 (repealed in 1996). Prior to its repeal, LSA-C.C. art. 2315.3 granted a right to seek an exemplary or punitive damage award to any person injured by a defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances. Conoco maintains that the award was made in error because its actions did not rise to the level of "wanton or reckless," and it was not involved in the "storage, handling, or transportation of hazardous or toxic substances."
The statute providing for exemplary damages for wanton and reckless disregard for public safety in storage, handling or transportation of hazardous or toxic substances must be strictly construed, as it imposes penalty. In re New Orleans Train Car Leakage Fire Litigation, 95-2710, 95-2721, 96-0016, 95-2734, 95-2, 671 So.2d 540 (La.App. 4 Cir. 3/20/96); writ denied, 96-0972, 96-0977, 96-0978, 96-0984, 96-1287, 96-1311 (La.6/28/96), 675 So.2d 1120-21; cert. denied, 519 U.S. 1009, 117 S.Ct. 512, 136 L.Ed.2d 402. To recover under this statute authorizing exemplary damages where a plaintiff's injuries were caused by defendant's wanton or reckless disregard for public safety in the storage, handling or transportation of hazardous or toxic substances, the plaintiff must prove: (1) that the defendant's conduct was wanton and reckless, involving extreme departure from ordinary care in situations where high degree of danger is apparent; (2) that the danger created by the defendant's conduct threatened or endangered public safety; (3) that the conduct occurred in the storage, handling or transportation of hazardous or toxic substances; and (4) that the plaintiff's injury was caused by the defendant's conduct. Billiot v. B.P. Oil Co., 93-1118 (La.9/29/94), 645 So.2d 604; See also Bourque v. Nan Ya Plastics Corp., America, 906 F.Supp. 348 (M.D.La.1995). For purposes *1246 of the code section providing for exemplary damages for wanton and reckless disregard for public safety in storage, handling or transportation of hazardous or toxic substances, implicit in "storing, handling or transporting" is the requirement that the hazardous substance be in the possession or control of the person who then handles or otherwise deals with that substance, though there is no requirement that the defendant be in possession and control of the hazardous substance at the time of a plaintiff's injury. In re New Orleans Train Car Leakage Fire Litigation, supra.
The evidence presented at trial revealed that prior to the excavation of the soil, Conoco performed a Level I site assessment, in which the properties were visual inspected. David Williams, the Conoco employee in charge of environmental concerns for the LOHC project, prepared an asbestos investigation report in which he noted that the Level I assessment revealed the existence of transite on the exterior of two of the abandoned houses on the site. However, a Level II assessment, which involves collecting samples, was not performed. According to Mr. Williams, who had no experience with asbestos or any asbestos-related training, the Level II assessment was not performed because it was not required by law. Furthermore, despite Conoco's policy that soil samples must be taken when an area is excavated and analyzed for hazardous materials, Mr. Williams admitted that he never told anyone about the presence of asbestos on the site. Rather, haulers were contracted to haul the soil away, without any indication that the transite was present at the site from which the soil was taken. In fact, after one of the property owners discovered the transite on his property, it was DEQ which notified Conoco that hazardous material had been found in the soil from the LOHC project site.
Additionally, one of Conoco's own witnesses, Mr. Coltrin, testified that an owner of a hazardous substance is responsible for that substance "from the cradle to the grave." He explained that this meant if Conoco owned the asbestos-containing material from the time it acquired it until it was properly disposed of at the appropriate landfill.
Based on the foregoing, I believe that the trial court's conclusion that Conoco's handling of the asbestos-containing material was wanton and reckless was not clearly wrong. Not only did Conoco fail to hire someone knowledgeable about asbestos to coordinate the project site, the employee in charge of doing so took no action after he discovered the presence of asbestos on the site. He did not have the soil tested, nor did he take any action to find out what to do about the transite, despite his testimony about the availability of "much more qualified people in the field of asbestos that work for Conoco." Furthermore, the employee failed to take any steps to prevent the soil from being disseminated into the public when he failed to inform the haulers of the soil that it contained asbestos.
I would also find that the actions of Conoco and its employee were reckless and endangered public safety. Despite knowledge that the soil contained pieces of transite, Conoco contracted with independent contractors to haul the soil without informing them that the soil was contaminated and without regard for where this soil could eventually end up. The soil ended up on the lawns of homeowners, who performed everyday activities, unknowingly endangering their own safety, as well as that of anyone who might visit them.
Next, I believe that the record supports the conclusion that the conduct occurred in the storage and/or handling of the transite. *1247 It is clear that Conoco knew that at least two of the houses scheduled for demolition contained transite. The company took no steps to ascertain whether any of the transite was contained in the soil from the site. It merely kept the soil at the site, while negotiating with haulers to transport the soil from the premises. Accordingly, I would affirm the trial court's award of punitive damage.

CONCLUSION
For the foregoing reasons, I would affirm the trial court's award of damages for increased risk of developing asbestos-related cancer, mental anguish, punitive damages, and diminished property value.
NOTES
[*] Retired Justice Walter F. Marcus, Jr., assigned as Justice ad hoc, sitting for Associate Justice Jeanette T. Knoll, recused.
[1] Transite is a product that contains crystalline silica, which is considered a hazard when inhaled and can be carcinogenic to humans.
[2] Plaintiffs' petition proposed the following class:

All persons in Calcasieu Parish who purchased from Daigle that came from Conoco which contained hazardous constituents such as asbestos and lead and who were not warned or apprised of the hazardous nature of the dirt; all persons in Calcasieu Parish who lived on or visited sites where the aforedescribed dirt was placed; and all persons in Calcasieu Parish who were exposed to and/or whose property was damaged by the aforedescribed dirt.
Defendants, their employees and agents, and any entity in which defendants had a controlling interest or franchise relationship were specifically excluded from the proposed class.
[3] The individual adult plaintiffs are Heather Lambert, David Lambert, Christine Goodness, David Goodness, Lasalle Williams, Betty Williams, Glenda Williams, Kathy Shephard, and George Shephard. The Shephards also brought claims on behalf of their three minor children, Donovan Shephard, Kendrick Shephard, and George Shephard, Jr.
[4] As we noted in Boudreaux, this policy is recognized in the rules of the United States Supreme Court. U.S. Sup.Ct. R. 24.1(a) provides, in pertinent part:

The questions [presented for review under Rule 14.1] shall be set out on the first page... The phrasing of the questions presented need not be identical with that in the petition for a writ of certiorari or the jurisdictional statement, but the brief may not raise additional questions or change the substance of the questions already presented in those documents. At its option, however, the Court may consider a plain error not among the questions presented but evident from the record and otherwise within its jurisdiction to decide.
Commenting on this rule in Kaisha v. U.S. Philips Corp., 510 U.S. 27, 114 S.Ct. 425, 126 L.Ed.2d 396 (1993), the Court stated:
Even before the first version of Rule 14.1(a) was adopted, we indicated our unwillingness to decide issues not presented in petitions for certiorari. As we stated in General Talking Pictures Corp. v. Western Elec. Co., 304 U.S. 175, 179[, 58 S.Ct. 849, 82 L.Ed. 1273] (1938): "One having obtained a writ of certiorari to review specified questions is not entitled here to obtain decision on any other issue." And as Justice Jackson stated... in Irvine v. California, 347 U.S. 128, 129-130[, 74 S.Ct. 381, 98 L.Ed. 561] (1954): "We disapprove the practice of smuggling additional questions into a case after we grant certiorari. The issues here are fixed by the petition unless we limit the grant, as frequently we do to avoid settled, frivolous or state law questions."
Kaisha, 510 U.S. at 32, n. 6, 114 S.Ct. 425, n. 6.
[5] The trial court's judgment awards plaintiffs a sum of damages for "physical injury and an increased risk of developing asbestos related cancer." Interpreting this award, plaintiffs contend that "[t]he trial court did not award damages for an increased risk of future injury, but for an actual insult that occurred when they inhaled Conoco's asbestos fibers." We find, however, that the trial court's award was not for an actual physical injury as the term is customarily used, but was instead for an increased risk of developing asbestos-related cancer that the trial court believed plaintiffs face. This interpretation is supported by a reading of the trial court's reasons for judgment as a whole. First, the trial court summarized one of the "elements" of damage plaintiffs demanded for Conoco's breach of a duty owed to them as "Physical Injury in the form of an increased risk of developing asbestos related cancer and other asbestos related illness." The court went on to state, "This Court finds that the plaintiffs have suffered an injury because they have been exposed to an asbestos fiber count which places each of them at an increased risk of developing an asbestos related cancer.... Though the injury to the plaintiffs is slight, it is an injury in fact. The Court finds that Conoco's breach resulted in actual injury to each plaintiff." Finally, in making the award Conoco complains of in its first assignment of error, the trial court stated, "[T]his court finds that children are likely to be more susceptible to the development of an asbestos related cancer, when exposed at a young age. Therefore, the Court, while awarding each adult plaintiff $10,000.00 for their physical injury, each child is hereby awarded $20,000.00 for their increased risk." Thus, in light of all of the above, it appears the trial court equated the award for "physical injury" with the award for "increased risk of developing asbestos related cancer." We will therefore treat the award as one commonly understood as an award for increased risk of developing a future disease.
[6] Effective July 9, 1999, Acts 1999, No. 989 amended La. C.C. art. 2315 to provide that "[d]amages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease." Thus, the amendment effectively eliminated medical monitoring as a compensable item of damage in the absence of a manifest physical or mental injury or disease. The provisions of the Act were made "applicable to all claims existing or actions pending on its effective date and all claims arising or actions filed on and after its effective date."

Subsequently, in Bourgeois v. A.P. Green Industries, Inc., 00-1528 (La.4/3/01), 783 So.2d 1251 ("Bourgeois II"), this court was called upon to resolve the issue of whether the legislature's amendment could constitutionally be applied to the Bourgeois plaintiffs, whose suit was filed on January 23, 1996. This court held that it could not, concluding that such a retroactive application of the Act would impermissibly divest the plaintiffs of a vested right in their accrued causes of action.
[7] Chrysotile is a form of asbestos that is considered less dusty and more easily eliminated from the human body than other forms of asbestos.
[8] Asbestos is considered "friable" if it crumbles or releases fibers when manipulated.
[9] According to Dr. Lee, the water supply in the region surrounding Lake Charles is transported via asbestos-containing cement pipes.
[10] Specifically, the trial court stated:

This Court makes particular note that it was swayed not only by the vast preponderance of the evidence indicating that the plaintiffs' fears were reasonable, but also with an abysmal effort of the defendants to attempt to present evidence that the plaintiffs fears were unreasonable. This Court finds that the reasonable and prudent man will experience worry and anxiety after learning that he is being or has been exposed to asbestos. To rule otherwise, this Court would be required to abandon all logic and reasoning.
[11] La. C.C. art. 2315.3 was repealed by Acts 1996, 1st Ex.Sess., No. 2, effective April 16, 1996. Section 2 of that Act provided, "The provisions of this Act shall only be applicable to causes of action which arise on or after the effective date hereof." Consequently, the provisions of former Article 2315.3 are applicable to the instant case.
[12] Because we conclude that Conoco's actions were not wanton and reckless, we need not reach the issue of whether Conoco was involved in the "storage, handling, or transportation of hazardous or toxic substances."