991 So.2d 1052 (2008)
Johnna WILSON
v.
Ralph Calvin DAVIS and Mary Lou White Davis.
No. 2007 CW 1929.
Court of Appeal of Louisiana, First Circuit.
May 28, 2008.
*1054 James D. "Buddy" Caldwell, Attorney General, State of Louisiana, Alden A. Clement, Jr., Clifton O. Bingham, Jr., Oats & Hudson, Baton Rouge, Louisiana, William Hudson, III, Lawrence Marino, Lafayette, Louisiana, for Defendants/Relators, The State of Louisiana through the Department of Environmental Quality and Michael Henry.
Michael G. Stag, Robert McMillin, Stuart H. Smith, Smith Stag, LLC, New Orleans, Louisiana, for Plaintiffs/Respondents, Johnna Wilson, individually and on behalf of her minor children, Jessica Wilson, Taylor Wilson, and John Wilson, and Ralph Calvin Davis and Mary Lou White Davis.
Jeffry L. Sanford, Suzette Cheri Smith-Harrison, Charles G. Clayton, Baton Rouge, Louisiana, for Plaintiffs/Respondents, Ralph Calvin Davis and Mary Lou White Davis.
Leonard Cardenas, III, John T. Joubert, Henri M. Saunders, Baton Rouge, LA, for Plaintiff/Respondent, Johnna Wilson.
Marshall Joseph Simien, Jr., Simien Law Firm, Lake Charles, LA, for Defendants, Coastal Radiation Services, Inc. and Lisle Posey.
Lisle Posey, In Proper Person, Mandeville, LA.
L. Paul Foreman, Christopher M. Trahan, Raggio, Cappel, Chozen & Berniard, Lake Charles, LA, for Defendants, Ideal Cement Company and Holcim (US), Inc.
Erin F. Parkinson, McGlinchey Stafford, PLLC, New Orleans, LA, Richard R. Bryan, Daniel J. Lynn, Washington, D.C., for Defendant, National Union Fire Insurance Company of Pittsburgh, P.A.
Patricia E. Weeks, Thomas E. Gottsegen, New Orleans, LA, for Defendant, ExxonMobil Corporation.
Leonard L. Kilgore, III, Bradley C. Myers, Melissa M. Cresson, Baton Rouge, LA, for Defendant, Kaiser Aluminum and Chemical Corporation.
Barbara L. Arras, New Orleans, LA, Steve J. Levine, J. Alan Harrell, Baton Rouge, LA, for Defendant, ICI Americas, Inc.
John Michael Parker, Anne J. Crochet, David M. Bienvenue, Jr., Timothy J. Poche, Baton Rouge, LA, for Defendant, Dow Chemical Company.
*1055 Glen Mercer, New Orleans, LA, for Defendant, Zurich American Inc.
Joseph Guichet, Ralph S. Hubbard, III, Tina L. Kappen, New Orleans, LA, for Travelers Casualty and Surety Company.
Before CARTER, C.J., WHIPPLE, KUHN, GAIDRY, and McDONALD, JJ.
GAIDRY, J.
The Louisiana Department of Environmental Quality ("DEQ") and Michael Henry ("Henry") have filed the underlying writ application seeking review of the trial court's denial of their motion for summary judgment. At issue herein is whether DEQ can be liable for alleged personal injury and property damages when a permittee has contaminated its neighbors' property and it is alleged that DEQ knew about the toxic contamination and failed to properly regulate its permittee. DEQ and Henry also contend that plaintiffs cannot maintain a claim arising from misrepresentations made by DEQ and/or Henry regarding the nature and extent of the contamination. Moreover, DEQ and Henry contend that the claims asserted against them had prescribed when the suit was filed and that the plaintiffs are unable to show that they have sustained any damages. For the following reasons, we grant the writ application, reverse the trial court's judgment denying the motion for summary judgment, and dismiss DEQ and Henry from the litigation.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
In 1973, DEQ's predecessor, the Nuclear Energy Division of the Louisiana Department of Natural Resources, Office of Environmental Affairs (hereinafter "DEQ"), issued a radioactive material license to Coastal Radiation Services, Inc. ("Coastal").[1] Coastal's facility was located at 6475 Bayou Paul Road and was owned by Lisle Posey. The property consisted of a lot of approximately a half acre, a wood home, and a corrugated metal shop.
On July 24, 1979, DEQ conducted a routine inspection of Coastal's property, which revealed concern about the adequacy of security for the radioactive materials on the site insofar as the storage facility had a plywood door that could be defeated with minimal effort. Thereafter, on July 28, 1979, DEQ returned to ascertain whether the door had been reinforced. At that time, DEQ indicated that "a high reading was noted near the carport area" and that "[v]isual inspections also revealed that a good quantity of lead had been piled on the ground right behind the carport. When this lead was removed, there were high readings coming from the soil at the back edge of the carport. It appeared that the carport and soil were contaminated." Further investigation determined that one of the major contaminants was Cesium-137. Thereafter, between 1979 and 1982, DEQ made regular visits to the site to ensure that Coastal took corrective action to clean the site and to measure the radioactive contaminants on the site. On March 17, 1982, DEQ noted that the highest exposure rate was "80 micro-R per hour" and indicated that "this matter is not closed, but an amendment for renewal of Coastal's license is being issued. This new license will not authorize the storage of any material at the Coastal facility in Sunshine, Louisiana, and Mr. Posey is looking for additional action that can be taken to further reduce the exposure levels at his facility."
*1056 On June 12, 2000, DEQ advised Johnna Wilson, who owned property adjacent to the Coastal site, that her property was contaminated with radioactive material. In 2000, DEQ referred the Coastal site to the Environmental Protection Agency (EPA). The EPA designated the Coastal site and the surrounding properties as a Superfund site and spent several million dollars remediating the contamination.
On October 24, 2000, Wilson, who purchased the property from Ralph Calvin Davis and Mary Lou White Davis in 1997, filed a Petition for Redhibition against the Davises, asserting that she purchased immovable property from them unaware of "any potential environmental hazards concerning the property including contaminated soil or water, hazardous waste or nuclear sources." Wilson alleged that she was entitled to, among other things, rescission of the sale and general damages for being exposed to the toxic materials.
On November 30, 2000, the Davises answered the petition and filed a third-party demand against Coastal, along with its principals, Lisle Posey, Frank A. Iddings, Calvin Pepper, Rodney Rogers, and Lee Miller, among others, asserting that they caused the contamination of said property in the course of Coastal's business by failing to properly handle, store, and transport radioactive wastes.[2]
Thereafter, on December 18, 2001, Wilson, individually and on behalf of her minor children, Jessica Wilson, Taylor Wilson, and John Wilson, (hereinafter sometimes collectively referred to as "Wilson") filed a "First Supplemental and Amended Petition" wherein Wilson named DEQ and Michael E. Henry, a senior environmental scientist with DEQ, as defendants, asserting that DEQ was aware of spillage and storage on the property at issue as early as 1979, but ceased inspection of the property in the early 1980s and allowed Coastal to continue its operations even though DEQ was well aware of the violative contamination. Wilson also alleged that the inspections resumed in 1988 and took place annually thereafter. Wilson contended that with each inspection, DEQ found violations of state regulations governing radioactive materials but failed to enforce them as mandated by its charter. Wilson alleged that if the DEQ had acted appropriately when it learned of Coastal's contamination, the parties herein would never have been exposed to hazardous levels of radioactive materials.
Regarding defendant Henry, Wilson alleged that as early as 1988, he conducted inspections of the site, but failed to adequately and accurately report the extent of the contamination on the property. Wilson also claimed that Henry made false statements to her regarding the extent of the contamination and the hazards associated therewith. Moreover, the Davises filed a "Supplemental and Amending Third Party Demand" asserting many of the same claims against DEQ and Henry.[3]
DEQ and Henry (sometimes collectively referred to as "DEQ" or "defendants") then filed a motion for summary judgment contending, among other things, that the claims asserted by Wilson and the Davises (collectively referred to as "plaintiffs") against DEQ were; prescribed, that DEQ owed no duty to plaintiffs herein, that plaintiffs offered no factual support for *1057 their claim of "fraudulent misrepresentation," and that plaintiffs offered no factual support for the elements of causation and damages. Following oral argument, the district court denied DEQ's motion for summary judgment. DEQ has timely filed the instant writ application, seeking review of the trial court's ruling.

ASSIGNMENTS OF ERROR
We summarize DEQ's assignments of error as follows:[4]
1) The district court erroneously denied DEQ's motion for summary judgment because the undisputed facts show that the plaintiffs' claims are prescribed.
2) The district court erroneously denied DEQ's motion for summary judgment because the Louisiana Supreme Court has held that any duty owed by DEQ does not extend to third parties such as plaintiffs in the instant case.
3) The district court erroneously denied DEQ's motion for summary judgment because plaintiffs cannot state a claim against defendants for regulatory liability under the preemptive regulatory framework established by the legislature pursuant to the constitutional authority.
4) The district court erroneously denied DEQ's motion for summary judgment because plaintiffs failed to show that defendants owed them any specific non-discretionary duty.
5) The district court erroneously denied DEQ's motion for summary judgment because plaintiffs failed to produce factual support sufficient to establish a genuine issue of material fact regarding the essential elements of "fraudulent misrepresentation."
6) The district court erroneously denied DEQ's motion for summary judgment because plaintiffs failed to produce factual support sufficient to establish that they will be able to satisfy their evidentiary burden of proving the essential elements of causation and damages at trial.
7) The district court erroneously denied DEQ's motion for summary judgment where plaintiffs offered no factual support for their claims of property damages.

DISCUSSION

DISCRETIONARY IMMUNITY
DEQ contends that plaintiffs have failed to establish that DEQ owed them any nondiscretionary duty herein. As such, DEQ opines that its acts are insulated by the discretionary act and policymaking immunity provided by LSA-R.S. 9:2798.1.[5]
In Fowler v. Roberts, 556 So.2d 1, 15 (La.1989) (on rehearing) (citing Berkovitz v. United States, 486 U.S. 531, 108 *1058 S.Ct. 1954, 100 L.Ed.2d 531 (1988)), the Louisiana Supreme Court adopted a two-step test for determining when this immunity applies. First, the exception does not apply when a statute, regulation, or policy specifically prescribes a course of action, i.e., where there is no element of choice or discretion involved. Second, the exception only confers immunity where the discretionary action involves the permissible exercise of a policy judgment grounded in social, economic or public policy. Fowler, 556 So.2d at 15; Chaney v. Nat'l R.R. Passenger Corp., 583 So.2d 926, 929 (La. App. 1 Cir.1991).
DEQ avers that in the instant case, the plaintiffs have failed to adequately allege, identify, describe, or present evidence of: (1) applicable statutes, rules or regulations that DEQ was mandated to have to comply with, or to have ensured other defendants complied with; (2) inspections that were mandated to have been performed, but were not; (3) specific non-discretionary duties defendants owed to them; (4) actions the state defendants were mandated to have taken, particularly with respect to warning of radioactive contamination; (5) when the specific breach of duty by the state defendants occurred; and (6) how any actions or inactions by the state defendants caused actual damage to plaintiffs or their property. Rather, DEQ notes that plaintiffs allege that DEQ violated duties imposed by a multitude of statutes, but avers that plaintiffs fail to cite specific examples of violations of mandatory statutory duties.[6] Accordingly, DEQ concludes that because plaintiffs are unable to show, with specificity, that DEQ violated any non-discretionary duty, it is immune from suit pursuant to La. R.S. 9:2798.1.[7]
In opposition, plaintiffs note that the Louisiana Legislature has entrusted the power to grant environmental permits to the DEQ and has authorized the DEQ to exercise quasi-judicial authority. Matter of American Waste & Pollution Control Co., 588 So.2d 367 (La.1991). In determining whether to grant or deny a permit, the DEQ Secretary "shall act as the primary public trustee of the environment, and shall consider and follow the will and intent of the Louisiana Constitution and Louisiana statutory law." La. R.S. 30:2014(A)(4).
Louisiana Constitution Article IX, § 1 provides:
The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.
In adopting the Louisiana Environmental Quality Act, the legislature specifically found that the "maintenance of a healthful and safe environment for the people of Louisiana is a matter of critical state concern." *1059 La. R.S. 30:2002(1). Moreover, "[i]t is necessary and desirable for the protection of the public welfare and property of the people of Louisiana that there be maintained at all times . . . strictly enforced programs . . . for the management of hazardous waste . . . [and] for the control of hazards due to natural and man-made radiation . . ." La. R.S. 30:2002(2).[8] The legislature further declared that "unannounced regular inspections of all facilities which may be regulated by this Subtitle or any facility in violation of this Subtitle" were essential to the success of the regulatory program. La. R.S. 30:2002(3).
Plaintiffs contend that although the DEQ issued a permit to Coastal and was actively involved in inspecting and monitoring the Coastal site between 1979 and 1982, DEQ allegedly failed to inspect or monitor the Coastal property thereafter until it began annual inspections again in 1988. Plaintiffs note that the "powers and duties" of the DEQ Secretary include the power "[t]o conduct inspections and investigations and enter facilities as provided in R.S. 30:2012." La. R.S. 30:2011(D)(13). Specifically, plaintiffs note that La. R.S. 30:2012(A), effective September 10, 1982, required DEQ to provide "timely and meaningful inspections of all facilities subject to the provisions of this Subtitle." One of the stated purposes of the inspections is to ensure that "[environmental standards have been achieved." Additionally, plaintiffs point out that La. R.S. 30:2012(D) (effective September 10, 1982, and prior to amendment by 2003 La. Acts No. 217, § 1) required that all facilities operating under a DEQ permit be inspected at least once annually.[9] Plaintiffs conclude that DEQ was required to conduct inspections of the property to ensure environmental compliance and the statutory provisions left DEQ no discretion in that regard.[10]
We agree that if DEQ issued Coastal an amended permit in 1982 to allow it to continue operating as a "facility" as defined in La. R.S. 30:2004(14),[11] then DEQ, *1060 pursuant to La. R.S. 30:2012(D), was required to perform annual inspections of the Coastal property. DEQ was also required to perform "meaningful inspections" of the facility in order to determine whether "[e]nvironmental standards have been achieved" in accord with La. R.S. 30:2012(A)(1).[12] DEQ's compliance with La. R.S. 30:2012(A)(1) and 30:2012(D) does not involve policymaking or discretionary duties, and failure to comply with the referenced statutes does not come within the scope of the statutory grant of immunity for such acts. La. R.S. 9:2798.1.
Although DEQ owes non-discretionary duties under La. R.S. 30:2012, plaintiffs were required to come forth with factual support sufficient to show that DEQ violated these duties. As recently noted by the Louisiana Supreme Court in Samaha v. Rau, 07-1726 (La.2/26/2008), 977 So.2d 880, the Louisiana Legislature in 1997 enacted La.Code Civ. P. art. 966(C)(2) to clarify the burden of proof in a summary judgment proceeding:
The burden of proof remains with movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
The court noted further:
This amendment, which closely parallels the language of Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), first places the burden of production evidence at the hearing on the motion for summary judgment on the mover (normally the defendant), who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent's case. At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial. . . . Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motions.
Id., 07-1726 at p. 5, 977 So.2d at 883. In Samaha, the court noted that a doctor in a medical malpractice action does not bear the burden of proof at trial so he is under no burden to present expert medical testimony in support of his motion for summary judgment to negate the plaintiffs' claim. Id. at 11, 977 So.2d at 887. As *1061 such, once the doctor claimed that plaintiffs could not meet their evidentiary burden to show that he breached the applicable standard of care, "the burden shifted to the plaintiffs to produce evidence to establish that they would be able to satisfy their evidentiary burden of proof at trial." Id. at 11-12, 977 So.2d at 887-88.
Herein, DEQ "pointed out," or made a prima facie showing, that the plaintiffs, who would bear the evidentiary burden of proof at trial, have failed to produce any facts to support their allegation that DEQ failed to conduct "annual" or "meaningful" inspections. We agree with that observation. Although plaintiffs allege that DEQ did not perform any inspections of the Coastal property after 1982, plaintiffs have failed to come forth with an affidavit, deposition, or any other evidence admissible under La. C.C.P. arts. 966 and 967 to show that DEQ failed to perform such inspections. We note that plaintiffs, in their own discovery responses, indicated that Michael Henry provided testimony regarding the frequency and regularity of DEQ's inspections after 1982. Although Michael Henry allegedly testified regarding these inspections, the plaintiffs did not provide the trial court with the relevant portions of Mr. Henry's deposition to allow the trial court to ascertain whether the inspections were performed annually as required by La. R.S. 30:2012(D). Similarly, while Henry allegedly testified as to the nature and extent of the inspections, plaintiffs failed to provide any deposition testimony to support their allegation that the inspections were not "meaningful." Additionally, although plaintiffs retained their own expert in this matter, no deposition, affidavit, or discovery responses were submitted in opposition to DEQ's motion for summary judgment to show why DEQ's inspections were deficient or not otherwise "meaningful." The factfinder, absent competent evidence regarding why DEQ's inspections were not "meaningful," could not properly conclude that DEQ failed to meet the non-discretionary duties it owed under La. R.S. 30:2012(A)(1) merely because the property at issue was contaminated as far back as 1979 and remediated for the contamination more than twenty years later. Plaintiffs' failure to produce evidence of a material factual dispute mandates the granting of the motion for summary judgment.

MISREPRESENTATION CLAIM
Independent of the non-discretionary statutory duties owed under Title 30, plaintiffs also asserted claims against DEQ and Henry arising from alleged misrepresentations defendants made in connection with the nature and extent of contamination on the property. Wilson alleged that as early as 1988, Henry conducted inspections of the site, but failed to adequately and accurately report the extent of the contamination on the property. Wilson further alleged that "as late as October 2001, DEQ misrepresented to petitioners the extent and hazards of the radioactive contamination" and that Henry "repeatedly made false statements to [her] regarding the extent of the contamination and the hazards associated therewith, lulling Johnna Wilson into a false sense of security."
In order to prove a claim of "fraudulent misrepresentation," the plaintiff must show: (1) a misrepresentation of material fact, (2) made with the intent to deceive, and (3) causing justifiable reliance with resulting injury. Systems Eng'g and Sec., Inc. v. Science & Eng'g Ass'ns, Inc., 06-0974, p. 3 (La.App. 4 Cir. 6/20/07), 962 So.2d 1089, 1091. DEQ contends that although plaintiffs allege that the contamination levels on the property were dangerous plaintiffs have offered no evidence to support this allegation. DEQ points to the deposition of Stanley Waligora, a health *1062 physicist with over 46 years of experience in the fields of radioactive contamination and remediation, wherein he testified that at the time of the alleged "misrepresentations" in 2000, he did not consider the radiation levels he found on the property to be of particular concern, although he indicated that he would have informed Ms. Wilson not to allow her children to play in areas that had elevated readings. DEQ emphasizes that plaintiffs were unable to show that DEQ misrepresented a material fact or intended to deceive them, especially given that plaintiffs' own expert did not consider the contamination serious enough to have warranted any extraordinary precautions.
DEQ also argues that the essential element of "detrimental reliance" is missing. DEQ contends that Ms. Wilson offered no evidence that she actually relied upon information provided to her by DEQ or Henry, or that any such reliance caused her tangible harm DEQ avers that Wilson had no contact with any DEQ employee prior to the survey conducted by James Pate on June 12, 2000, and she moved from the contaminated property within (4) months of learning of the contamination in June 2000, and within two (2) months of her own site assessment in August 2000. Based upon her actions, DEQ concludes that Ms. Wilson simply did not show that she detrimentally relied on any statement by DEQ or Henry.
In opposition, plaintiffs contend that DEQ knew about the radioactive contamination at the Coastal site since 1979, yet failed to inform the public and neighboring property owners about the dangers until 2001. Plaintiffs argue that fraud need not require an active misrepresentation, but may result from defendants' suppression of the truth.
Moreover, plaintiffs note that Johnna Wilson, after learning about the radioactive contamination of her property, went to the DEQ offices to learn more. Wilson testified:
Q: Did you contact anyone at DEQ to follow up and see how bad it [contamination] was or get any more information?
A: I drove up to the office on Bluebonnet, and I went in there and, you know, asked for the file or asked to speak with somebody . . . And finally I got the file. It was just a, you know, manila folder with some papers in it. So then I asked to copy it, and I think it was Mike Henry like came out and was just like kind of intimidating I should say.
* * *
Q: Okay. And what did he say?
* * *
A: I was to say he said it  that, you know it wasn't harmful, and, you know, I shouldn't be worried about any of that, and  and it's nothing to file a lawsuit over. That's what I remember him saying that first day.
Q: Did you say anything about filing a lawsuit?
A: No. I was just trying to figure out what it was, what was there, if it was harmful or not.
Plaintiffs contend that subsequent EPA investigations demonstrated that the contamination levels on Ms. Wilson's property were dangerous. Plaintiffs also note that the EPA eventually spent several million dollars cleaning up the contamination at the Superfund site. Plaintiffs conclude that the EPA's findings during the Superfund cleanup demonstrated the falsity of DEQ's claims that the radioactive contamination was not harmful.
*1063 Plaintiffs do not allege that DEQ or Henry made any fraudulent statements to the Davises, Rather, plaintiffs contend that the Davises' action arises from defendants' suppression of the truth in failing to adequately and accurately report the extent of the contamination on the property. However, plaintiffs have offered no affidavit, deposition, or other evidence admissible under La. C.C.P. arts. 966 and 967 to show that the defenders failed to adequately and/or accurately report the contamination at the Coastal site. Rather, the only assertions in that regard were made by plaintiffs in their memoranda submitted in opposition to the defendants' motion for summary judgment. Thus, the plaintiffs' position on that point was not evidence, but mere argument. Haney v. Davis, 04-1716, p. 9 (La.App. 4 Cir. 1/19/06), 925 So.2d 591, 597, writ denied, 06-0413 (La.4/28/06), 927 So.2d 293. Summary judgment cannot be defeated by mere argument. Argument of counsel and briefs, no matter how artful, are not sufficient to raise a genuine issue of material fact. Id., 04-1716 at pp. 9-10, 925 So.2d at 597. Moreover, although plaintiffs assert that defendants failed to inform the public and neighboring property owners about the dangers of the site until 2001, plaintiffs have not cited any non-discretionary duty mandating defendants do so.
Wilson alleges that after she learned of the contamination, Henry informed her that the contamination was not dangerous. Assuming that the contamination was unsafe and Henry made such statements with an intent to deceive, Wilson is unable to show that she detrimentally relied upon Henry's statements. We note that after learning of the contamination and following the referenced conversation with Henry, Wilson contacted Keith Varnado of Radiation Protection Resources, Inc. to come to the property to "check it out and take samples" to ascertain the nature and extent of the contamination. As such, Wilson cannot reasonably contend that she relied upon any statement made by Henry or DEQ, inasmuch as she requested her own independent site assessment even after Henry allegedly assured her that the contamination was not dangerous.
Because we find that plaintiffs will be unable to meet their burden of proof at trial to show that the defenders breached a non-discretionary duty and that defendants intentionally misrepresented the nature and extent of the contamination, we pretermit discussion of defendants' remaining assignments of error.

CONCLUSION
For the foregoing reasons, we hereby grant the writ application, reverse the trial court's judgment denying the motion for summary judgment filed on behalf of the Louisiana Department of Environmental Quality and Michael Henry, and grant the motion and dismiss the Louisiana Department of Environmental Quality and Michael Henry from the litigation.
WRIT GRANTED, JUDGMENT DENYING MOTION FOR SUMMARY JUDGMENT REVERSED, MOTION FOR SUMMARY JUDGMENT GRANTED, AND PLAINTIFFS' CAUSES OF ACTION AGAINST DEFENDANTS-MOVERS DISMISSED.
WHIPPLE, J., dissents for reasons assigned.
KUHN, J., concurs with reasons.
CARTER, C.J., dissents for reasons assigned by WHIPPLE, J.
WHIPPLE, J., dissents.
As the majority correctly notes, in adopting the Louisiana Environmental Quality Act, the legislature specifically *1064 found that the "maintenance of a healthful and safe environment for the people of Louisiana is a matter of critical state concern." LSA-R.S. 30:2002(1). Indeed, the legislature has recognized that "[i]t is necessary and desirable for the protection of the public welfare and property of the people of Louisiana that there be maintained at all times . . . strictly enforced programs . . . for the management of hazardous waste . . . [and] for the control of hazards due to natural and man-made radiation. . . ." LSA-R.S. 30:2002(2). In keeping with the laudatory goal of protecting the public, the legislature specifically declared that "unannounced regular inspections of all facilities which may be regulated by this Subtitle or any facility in violation of this Subtitle" are essential to the success of the regulatory program. LSA-R.S. 30:2002(3). Thus, I agree with the majority that relator herein, the DEQ, owed non-discretionary duties to provide both annual and meaningful inspections of the Coastal property.
Moreover, as noted (and supported) by plaintiffs herein, although the DEQ issued a permit to Coastal for the storage and handling of radioactive materials, and, additionally, was actively involved in inspecting and monitoring the Coastal site between 1979 and 1982, the DEQ nonetheless failed to inspect or monitor the Coastal property thereafter until it began annual inspections again in 1988.
As the party seeking summary judgment in its favor, the DEQ was required to "point out" the "absence of factual support for one or more elements essential to the [plaintiffs'] claim, action, or defense," pursuant to LSA-C.C.P. art. 966 C(2). In my view, the DEQ has failed to meet this burden.
Based on the Plaintiffs' Answers to Interrogatories alone, which the DEQ attached in support of its motion for summary judgment, genuine issues of material fact remain. Particularly, in Response to Interrogatory Number 12, when questioned about the specific information they possessed regarding the inspections, plaintiffs responded in part, as follows:
Plaintiff avers that, as Mr. Henry testified during his deposition, LDEQ was to perform annual inspections of the properties, but Mr. Henry's review of LDEQ's files revealed no documentation of these required annual visits. It is LDEQ policy to document inspections of contaminated property, but LDEQ failed to do so. Mr. Henry further testified that it would have been better to have a report of those annual visits considering the contamination on the property. Mr. Henry further testified that the lack of documentation may indicate that the annual inspections may have been mere "drive by inspections," which are not routinely done by LDEQ. (Emphasis added).
The DEQ did not attach Henry's, deposition (or any other such evidence) to its motion for summary judgment to demonstrate that plaintiffs' summary of Henry's testimony was inaccurate. Moreover, the DEQ has made no evidentiary showing whatsoever to otherwise attack the veracity of plaintiffs' responses. Because the Plaintiffs' Answers to Interrogatories disclose that genuine issues of material fact remain as to the occurrence, as well as frequency and adequacy of the inspections, the DEQ failed to meet its initial burden as mover of "pointing out" a lack of support for the plaintiffs' claims. Given this initial failure by the DEQ, I find that contrary to the reasoning employed by the majority, plaintiffs were not required to come forth with some other or additional, *1065 competent evidence relating to the inspections at issue to somehow "disprove" a showing not made by the DEQ herein. Accordingly, the majority errs in finding the DEQ is entitled to judgment in its favor, as a matter of law, on the basis of this record.[1]
In the instant case, the DEQ was the agency that permitted Coastal to operate the facility at issue and knew that Coastal was in violation of the environmental standards. Requiring the DEQ to adhere to the statutory mandate to conduct meaningful inspections of the Coastal property to ensure that "[e]nvironmental standards have been achieved" would not place too onerous a burden on the DEQ, especially since DEQ was undisputedly aware that Coastal was in violation of the environmental regulations. Because the Constitution and various statutory standards required that the DEQ perform such inspections to discharge its duty to protect the environment as well as the health, safety, and welfare of the people, I find that genuine issues of material fact remain herein to preclude dismissal of plaintiffs' claims by summary judgment.
Thus, I respectfully dissent.
KUHN, J., concurs.
In addition to finding that plaintiffs have failed to meet the requisite burden of showing that DEQ violated any alleged non-discretionary duty, I also find that the plaintiffs are unable to meet their burden of proof on the issue of damages.
Johnna Wilson asserts that she is entitled to damages resulting from the overt contamination on her property, because it has lost value and is not marketable. Nevertheless, following remediation of her property, Wilson testified that she sold the property or otherwise transferred it back to the Davises.[1] Although Wilson transferred the property, she has failed to present any evidence to meet her burden of proof to show that the value of her property was diminished or that she received less than she otherwise would have received from the transfer had the property never been contaminated.[2] By contrast, see Bonnette v. Conoco, 2001-2767 (La.1/28/03), 837 So.2d 1219, where plaintiffs were awarded a 10% diminution in the value of their property after a real estate appraisal expert provided testimony regarding the value of each plaintiffs property following asbestos abatement.[3] Absent evidence to show any diminution in her property value following remediation, *1066 I find that Wilson will be unable to meet her evidentiary burden of proof on the property damage claim.[4]
Plaintiffs also allege that they are entitled to damages for emotional distress arising from their exposure to dangerous levels of radiation. Neither the Davises nor the Wilsons have presented any evidence that they have sustained any physical injury related to their alleged exposure to radiation.[5] Absent physical injury, plaintiffs must prove an "especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." Moresi v. State through Dept. of Wildlife & Fisheries, 567 So.2d 1081, 1096 (La.1990). Plaintiffs are unable to meet the burden established by La.Code Civ. P. art. 966.
Johnna Wilson testified that there was a significant amount of radiation found in her backyard, including around the area where her children played on their swing. She further testified that following the discovery of radiation on her property she had "two or three" sessions with a counselor provided by her employer and that she generally worried that she and her children might contract cancer. Although Johnna Wilson's testimony indicates a general fear of contracting a disease related to radiation exposure, such testimony is insufficient to prove that she suffered genuine and serious mental distress. See Bonnette, 837 So.2d at 1235-1236. Moreover, the Davises presented no evidence to support their claims for emotional distress. Accordingly, I find that plaintiffs have not met their burden of proof to show an "especial likelihood of genuine and serious mental distress" and therefore are unable to recover damages for emotional distress.
I also note that the majority's decision contains dicta regarding the non-discretionary duties that DEQ may owe under these circumstances. Insofar as the majority finds that plaintiffs failed to introduce evidence sufficient to meet their burden of proving that DEQ violated any particular statute, there is no need to address whether any specific statute contains a non-discretionary duty. Moreover, even if a specific statute imposes a non-discretionary duty on DEQ, the majority did not reach the issue of whether any specific non-discretionary duty was owed to third parties.
For these reasons, I respectfully concur.
NOTES
[1] The "Office of Environmental Affairs" was consolidated into the newly-created "Department of Environmental Quality" by 1983 La. Acts No. 97, § 16, effective February 1, 1984.
[2] The unknown insurers were also named as defendants therein.
[3] Wilson settled her claims with the Davis defendants and their insurer, State Farm Fire and Casualty Company and State Farm General Insurance Company.
[4] We note that DEQ also raised as an assignment of error the district court's failure to grant those portions of DEQ's motion that were unopposed insofar as plaintiffs conceded that they were not bringing claims for lost wages, exemplary damages, or causes of action under La. Civ.Code arts. 667, 668, 2317 and 2317.1. However, we note that the plaintiffs subsequently filed a Motion for Voluntary Partial Dismissal With Prejudice, which was granted by the trial court and dismissed the referenced claims.
[5] Louisiana Revised Statutes 9:2798.1(B) provides:

Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
[6] More particularly, plaintiffs assert that DEQ violated Louisiana Constitution Art. IX., Sec. 1, Titles 30 and 33 of the Louisiana Revised Statutes, including [but not limited to] La. R.S. 30:2002, 2011, 2012, 2014.1, 2018, 2022, 2025, 2027, 2030, 2104, 2104(A)(9), 2104(A)(14), 2107, 2113, 2117, 2131, 2151, 2180, and La. R.S. 33:460 and 461 [and] 10 CFR 20 et seq. and 40 C.F.R. et seq. DEQ concludes that merely citing statutory authority, without specific examples of violations of mandatory statutory duties, is insufficient to defeat its motion for summary judgment.
[7] Moreover, DEQ avers that despite plaintiffs' contentions, it did not "ignore" the contamination at the Coastal site. DEQ avers that following the spill in 1979, DEQ, on its own initiative, monitored the site on a regular basis and completed many levels of remediation through the time the EPA was brought in by DEQ in 2000.
[8] Moreover, the legislature also adopted the Nuclear Energy and Radiation Control Law, La. R.S. 30:2101, et seq. Louisiana Revised Statutes 30:2102 defines the legislature's policy and purpose in adopting the law as follows:

The legislature finds and declares that the supervision and control of the development and operation of nuclear energy and radial ion emitting processes and facilities are of vital concern to the welfare of the citizens of the state of Louisiana, as well as the protection of the environmental resources within the state. To insure the safety and welfare of the people and environmental resources of Louisiana in this regard, it is necessary to provide an efficient system to regulate and control the development and utilization of all sources of radiation within the state of Louisiana.
[9] Louisiana Revised Statutes 30:2012(D) provided:

A monitoring inspection of all facilities operating with a permit issued pursuant to this Subtitle shall be made at least once annually . . .
2003 La. Acts No. 217, § 1, rewrote subsection D and requires that inspections be performed, but it no longer statutorily requires that they be performed annually.
[10] We note that plaintiffs also cited La. R.S. 30:2012(D)(1) which provides that the DEQ secretary "shall prepare, implement, and revise, as needed, a compliance monitoring strategy designed to achieve meaningful environmental results. Inspections shall be both intensive, designed to accomplish meaningful environmental results and routine to ensure compliance presence in that field." However, this portion of the statute was amended by 2003 La. Acts No. 117, and was not in effect during the time period at issue.
[11] "Facility" is defined in La. R.S. 30:2004(14) as follows:

"Facility" means a pollution source or any public or private property or facility where an activity is conducted which is required to be regulated under this Subtitle and which does or has the potential to do any of the following:
. . .
(c) Use or control radioactive materials or waste.
. . .
(e) Generate, transport, treat, store, or dispose of hazardous wastes.
[12] Although La. R.S. 30:2012(D), pursuant to 1982 La. Acts. No. 655, § 1, did not take effect until September 10, 1982, DEQ would nonetheless have a non-discretionary duty to provide unannounced regular inspections of the facility after the statute became effective.
[1] By contrast, in Samaha v. Rau, 07-1726 (La.2/26/2008), 977 So.2d 880, the defendant physician, who was required to point out "that the plaintiffs did not have expert medical testimony necessary to prove their claim," attached to his motion for summary judgment the plaintiffs' responses to interrogatories along with the opinion of the medical review panel and an affidavit of correction relative to the opinion. In their answers to interrogatories, the plaintiffs identified an expert witness but admitted that no written report from the expert existed. As such, plaintiffs' response supported the defendant physicians' position that plaintiffs would be unable to meet their evidentiary burden of proof at trial.
[1] When questioned regarding this transfer, Wilson indicated that she did not "know if it was a sale exactly," but it "was just the money that was left owed on the house. Like in other words, they took my loan and paid it."
[2] Likewise, assuming that the alleged property damage claim could be transferred, the Davises have also failed to present any evidence to show a diminution in the property's value.
[3] In Bonnette, the expert testified that he utilized a typical Fannie Mae report to ascertain the market value of the property. Moreover, he testified that market value included a "stigma adjustment" because the word "asbestos" is frightening, most people are aware that it is a carcinogen, and people are still concerned even after asbestos is remediated.
[4] Louisiana Code of Civil Procedure art. 966(C)(2) only requires DEQ, which does not bear the burden of proof at trial, to point out that "there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense." At that point, La.Code Civ. P. art. 966(C)(2) requires the adverse party to "produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial." See also Samaha v. Rau, 07-1726 (La.2/26/2008), 977 So.2d 880.
[5] Moreover, the Environmental Protection Agency ("EPA") provided a "whole body counter" for the residents of the area whose property was affected, including the Wilsons, and a report prepared by the EPA indicated that "All individuals scanned showed no detection of cesium 137 in their bodies." The EPA report further indicted that "No health affects which are attributable to the [Coastal] site can be measured in residents."